COMMODITY FUTURES TRADING
COMMISSION; State of New
Jersey; State of Florida

v.

AMERICAN METALS EXCHANGE
CORP.; Anglo Swiss Metals, Ltd.; F.C.
& M. Investment Corp.; and Bill Frank;
Trans World Metals Corporation;
Amalgamated Redemption Centers,
Inc.; Robert Maxwell, a/k/a Robert Le-
bovich; Michael Jebrock.

Robert and Ethel Miner, Movants.

Robert Maxwell a/k/a Robert
Lebovich, Appellant.

Nos. 91–5935, 91–5998.

United States Court of Appeals,
Third Circuit.

Argued May 8, 1992.

Decided April 8, 1993.

Joanne T. Medero, Gen. Counsel, Jay L. Witkin, Deputy Gen. Counsel, James T. Kelly (argued), Asst. Gen. Counsel, Commodity Futures Trading Com'n, Washington, DC, for Commodity Futures Trading Com'n.

Robert J. Del Tufo, Atty. Gen. of N.J., Kelly A. Lynch, Newark, NJ for State of NJ.

Robert K. Good, State of Fla., Dept. of Banking & Finance, Orlando, FL, for State of FL.

William F. Maderer, Robert B. Nussbaum, Saiber, Schlesinger, Satz & Goldstein, Newark, NJ, Elkan Abramowitz (argued), Barry A. Bohrer, Jeremy H. Temkin, Morvillo, Abramowitz, Grand, Iason & Silberberg, New York City, for Robert Maxwell a/k/a Robert Lebovich.

Before BECKER, NYGAARD and ROTH, Circuit Judges.

## OPINION OF THE COURT

ROTH, Circuit Judge.

In this action, filed under the Commodity Exchange Act and the securities laws of New Jersey and Florida, defendant Robert Maxwell appeals the district court's orders granting summary judgment and ancillary relief in favor of plaintiffs, the Commodity Futures Trading Commission ("CFTC") and the states of New Jersey and Florida. Specifically, Maxwell challenges the court's decision to freeze his assets and its orders holding the defendants jointly and severally liable to disgorge ill-gotten gains in an amount equal to investor losses. Maxwell argues that the district court abused its discretion in fashioning such equitable relief ancillary to the permanent injunction it granted. Maxwell also appeals the district court's reliance in granting summary judgment on factual findings that the court made as part of its preliminary injunction determination. For the reasons set forth below, we will affirm the grant of summary judgment, but we will vacate the disgorgement orders and remand the case to the district court for further proceedings consistent with this opinion.

## I. Background

### A.

The case has a complex factual and procedural history. The complaint, filed on June 30, 1987, alleged that American Metals Exchange Corporation ("AME"), Anglo Swiss Metals, Ltd., FC & M Investment Corp., and William Frank were engaging in the offer and sale of illegal off-exchange futures contracts and were defrauding the public in violation of provisions of the Commodity Exchange Act, as amended, (the "Act"), 7 U.S.C. §§ 1–24 (1988), and the securities laws of New Jersey and Florida.

The complaint alleged that from May 1986 to June 1987 the defendants sold an illegal, off-exchange investment program through which 2000 investors purchased specific quantities of precious metals at prevailing market prices. The investment program, called the Equity Building Program ("EBP"), offered purchasers the chance to speculate on price changes in precious metals. EBP contract purchasers made a down payment toward the total price of their investment.[1] Investors then had two years to pay off the remaining balance on their purchase and either to take delivery of the metal or to contract with a third party to liquidate their positions. Investors could also extend the contract through the payment of additional fees. Whether profits were earned or losses sustained depended on the difference between the price of the precious metal at the time of the contract's purchase and of its sale.

On July 2, 1987, two days after the filing of the complaint, the district court granted plaintiffs' application for a preliminary injunction and an order freezing the assets of the defendants. The injunction prohibited the defendants from engaging in the commodity futures business. The court also designated a temporary equity receiver and appointed Arthur Young & Co. as accountant to the receiver.[2]

Subsequently, on December 23, 1987, the plaintiffs filed an amended complaint which asserted additional counts under the Florida securities laws and named Robert Maxwell, Amalgamated Redemption Centers, Inc. ("ARC"), Trans World Metals Corporation, and Michael Jebrock as additional defendants. After a series of hearings, the district court extended the preliminary injunction to Maxwell and the other new defendants. *CFTC v. American Metals Exch. Corp.*, 693 F.Supp. 168 (D.N.J.1988). The court found that the plaintiffs had shown a likelihood of proving that the defendants were violating provisions of the Commodity Exchange Act by selling metals futures without seeking a designation as a contract market or operating subject to the rules of such a market and by falsely representing, with a deliberate attempt to do so, the risk, cost, profitability, and security of an investment in an EBP contract. The court appointed an equitable receiver for the corporate defendants ARC and Trans World Metals, froze the corporate assets, and ordered an accounting of their assets and liabilities. The court also froze the assets of the individual defendants Maxwell and Jebrock after making findings of fact showing Maxwell's control over AME and ARC and Jebrock's role at AME and Trans World Metals.[3]

1. Only one-half of this thirty percent down payment, or fifteen percent of the total purchase price, went toward the purchase of the metals futures. The other fifteen percent constituted an administrative fee.

2. The four defendants named in the original complaint consented to the preliminary injunction.

3. The court's determination that the plaintiffs had demonstrated likely success on the merits with respect to their claims for past and future violations of the Commodity Exchange Act was a sufficient basis for issuing the injunctive and equitable relief and did not require the court to consider the likelihood of plaintiffs' success in proving the alleged violations of the securities laws of New Jersey and Florida. Under section 6c of the Act, as amended, 7 U.S.C. § 13a–1, injunctive relief may issue upon a showing that the defendants "engaged in, [are] engaging in, or [are] about to engage in any act or practice constituting a violation of any provision of the Act." The plaintiff also needed to show that the defendants were still in business so that there was a likelihood that violations would continue. *See CFTC v. American Bd. of Trade*, 803 F.2d 1242, 1251 (2d Cir.1986). The standard for an injunction under the Act differs from that in the normal civil context in that proof of irreparable

The order permitted the individual defendants to apply to the court for "reasonable and necessary living expenses." The defendants named in the amended complaint opposed the issuance of such relief.

Defendant Maxwell retained new counsel and pursued two interlocutory appeals.[4] On March 23, 1989, this Court dismissed Maxwell's first appeal, a challenge to the asset freeze, on jurisdictional grounds. Maxwell withdrew his second appeal. During this period, Maxwell also contended with criminal charges arising from the same conduct at issue in this action. The states of New Jersey and Florida brought charges against him in December 1988. On October 23, 1989, Maxwell pled guilty in New Jersey state court to one count of selling an unregistered security. Maxwell subsequently pled nolo contendere in Florida state court to one count each of selling a security by an unregistered broker and of selling unregistered securities.[5]

On March 12, 1990, the district court granted summary judgment in favor of the plaintiffs and against all the defendants on Count I of the amended complaint, which count asserted violations of Section 4(a) of the Act, as amended, 7 U.S.C. § 6(a)

(1988).[6] At the same time, the court denied the application of the plaintiffs for permanent injunctive relief. The court held that the plaintiffs had not adequately demonstrated the likelihood of future violations necessary to support the entry of a permanent injunction. However, the court did grant the plaintiffs' request for ancillary relief. The court held the defendants jointly and severally liable to disgorge the profits they had received either directly or indirectly from their trading in the illegal futures contracts. The court ruled further that, since the defendants' ill-gotten gains could not be measured individually, the amount of disgorgement would equal the total losses suffered by individuals who invested in EBP contracts.

Subsequently, on May 16, 1991, after further briefing, discovery and oral argument, the district court granted summary judgment for the plaintiffs on Counts II through VIII of their amended complaint.[7] *CFTC v. American Metals Exch. Corp.*, 775 F.Supp. 767 (D.N.J.1991). In addition, the court set at $15,593,037.84 the total amount of investor losses for which the defendants would be jointly and severally liable as disgorgement payments. Finally,

harm is not required. *See, e.g., CFTC v. Morgan, Harris & Scott, Ltd.*, 484 F.Supp. 669, 676–77 (S.D.N.Y.1979).

4. Maxwell also moved for the district court to stay the asset freeze pending appeal. By a bench ruling dated October 12, 1988, the district court denied his motion.

5. As a condition of this plea, Maxwell testified in criminal cases against Bill Frank and Michael Jebrock in Florida.

6. Section 4(a) requires that persons offering to conduct or conducting business in the United States which involves a contract for a purchase or sale of a commodity for future delivery must be a member of a board of trade which has been designated by the CFTC as a "contract market." None of the corporate defendants were members of a CFTC designated contract market. The district court had determined previously that the EBP, the precious metals investment program which the defendants were selling, was a commodities futures contract. *See* 693 F.Supp. at 192. Robert Maxwell was the only defendant who opposed the plaintiffs' motion for summary judgment.

7. These counts alleged violations of and sought injunctive and ancillary relief and a permanent injunction against all defendants under the Act, the New Jersey Uniform Securities Law, N.J.S.A. 49:3–50, *et seq.* (1989), and the Florida Securities and Investor Protection Act, Fla.Stat. Ann. § 517.101 *et seq.* (1991).

Specifically, the plaintiffs alleged that the defendants committed fraud in connection with the sale of commodities for future delivery in violation of § 4b(a) of the Act, as amended, 7 U.S.C. § 6b(a) (1988) (Count II); that the EBP constituted the offer and sale of unregistered securities in New Jersey in violation of N.J.S.A. 49:3–60 (Count III); that the defendants failed to register as broker dealers in New Jersey in violation of N.J.S.A. 49:3–56 (Count IV); that the defendants committed fraud in connection with the sale of "securities" in violation of N.J.S.A. 49:3–52 (Count V); that the defendants committed fraud in connection with the sale of "investments" in violation of Fla.Stat. §§ 517.-301(1) and 517.312(1)(a) (Count VI); that the defendants sold the EBP in Florida through a "boiler room" in violation of Fla.Stat. § 517.-312(1) (Count VI); and that the defendants violated the Act in violation of Fla.Stat. § 517.275 (Count VIII).

on November 14, 1991, the court converted the preliminary injunction into a permanent injunction. The court at the same time ordered the temporary equity receiver to serve as the permanent equity receiver for the corporate defendants, ordered the defendants, jointly and severally, to pay the $15,593,037.84 in disgorgement to the receiver's estate for the benefit of the investors, and extended the asset freeze until such time as full payment to the receiver had been made. Defendant Robert Maxwell alone appeals from the district court's summary judgment orders as well as its orders granting ancillary equitable relief.

## B.

The evidence shows that early in 1986, Bill Frank of Short Hills, New Jersey, and Michael Jebrock of Coral Springs, Florida, made plans to sell the Equity Building Program to the public. The program offered potential customers a deferred delivery investment in precious metals. Frank and Jebrock had previously sold other precious metal investments to the public. In search of capital, Frank introduced Jebrock to Robert Maxwell, the owner of a furniture business in New York. Frank had known Maxwell for over thirty-five years. Maxwell agreed to invest in the proposed business.

The defendants formed several corporations through which they conducted the business. Frank became president of defendant American Metals Exchange Corporation. Jebrock became president of and part owner of defendant Trans World Metals Corporation. AME, which maintained offices in Millburn, New Jersey, sold the EBP contracts to the public through defendants FC & M and Trans World Metals. FC & M occupied space in AME's Millburn offices but used a different mailing address. Trans World Metals operated out of offices in Coral Gables, Florida. FC & M was owned by defendant Frank along with Steven Kramer, AME's head trader, and Gordon Friedman. Anglo Swiss Metals, Ltd., a Panamanian corporation, was established to became the owner of AME.[8] Between May 11, 1986, and June 30, 1987, AME paid over $7.1 million in commissions to FC & M, Trans World Metals, and other sales agents.

Amalgamated Redemption Centers, Inc., was established as the primary liquidation agent which AME's customers used to facilitate the delivery and sale of their metal positions. If a customer's precious metals investment had appreciated, ARC would advance to AME the balance due on the EBP contract, arrange the sale of the precious metal, and draft a check for the customer. ARC was the only liquidation agent that AME recommended to its clients. For its services in helping EBP investors unwind their metal positions, ARC charged customers 2.5% of the contract's value plus additional fees for handling the metals.

The record shows that AME and ARC did not physically transfer metals but prepared offsetting paperwork transactions. Substantially all of ARC's receipts were funds transferred from AME. ARC operated out of offices in New York City leased from and shared with Maxwell's furniture companies. Robert Maxwell used the furniture companies' attorneys to incorporate ARC. Maxwell was involved in ARC's business and used his real name, Robert Lebovitch, to sign the checks ARC sent to customers who liquidated their contracts.

Sales of the Equity Building Program to the public began in May 1986. In April 1987, prices on the precious metals markets fluctuated widely, and customer liquidation demands increased. Because AME had not properly hedged to minimize risk, it could

---

8. Defendant Bill Frank was the President and a director of Anglo–Swiss. Frank owned a 19% interest in the corporation together with his partners from FC & M. Defendant Michael Jebrock and a Mr. Michael Wallach jointly owned 10% of Anglo–Swiss and had the right to purchase another 10% of the corporation from shares held as treasury stock. Jebrock was the First Vice–President and a director of Anglo–Swiss. Maxwell held a 25.01% interest in Anglo–Swiss. Jack Gold, one of Maxwell's business partners also owned a 25.01% interest. Gerald Edson, who was not a party to this action, owned 9.98% of the shares. The Anglo–Swiss shareholders agreement, dated June 1986, showed that Maxwell, Gold, and Edson served as outside or non-officer directors to the corporation.

not cover its positions in the legitimate futures markets. Confronted with a $3 million margin call, AME was forced to liquidate its futures positions. In two days, AME sustained $4.4 million market losses.

Though ARC could not keep pace with a backlog of customer liquidation demands, AME through FC & M and Trans World Metals continued to sell EBP contracts to the public. AME then used incoming customer funds to pay off existing customers who desired to liquidate through ARC. Maxwell resigned from ARC on June 2, 1987, after attempting to sell the company to Carol Kahan, his assistant at ARC. The original complaint in this action was filed four weeks later, on June 30, 1987.

## II. Merits

### A.

Federal subject matter jurisdiction for this action lies under 7 U.S.C. §§ 13a–1 and 13a–2. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

■ Our scope of review of the district court's granting of equitable relief, in determining the amount of disgorgement and the extent of the freeze of appellant's assets, is for abuse of discretion. *See McLendon v. Continental Can Co.,* 908 F.2d 1171, 1177 (3d Cir.1990). Our review of the granting of summary judgment is plenary. We apply the same standard that should be utilized by the district court; that is, we determine whether "the record reveals a disputed issue of material fact and, if not whether the moving party is entitled to judgment as a matter of law." *Little v. MGIC Indem. Corp.,* 836 F.2d 789, 792 (3d Cir.1987); *Erie Telecommunications, Inc. v. City of Erie,* 853 F.2d 1084, 1093 (3d Cir.1988).

### B.

We will address first the propriety of the district court's order that the defendants disgorge their unlawful profits in an amount equal to investor losses. Maxwell does not challenge the propriety of disgorgement as an equitable remedy.[9] Maxwell does, however, challenge the extent of disgorgement ordered in this action. Maxwell contends the district court ignored settled law governing the availability of the remedy in that the court did not hold a hearing to determine the extent of Maxwell's profits and that it set the amount of disgorgement in the total amount lost by the investors. He asserts that disgorgement should serve primarily to prevent unjust enrichment. He points out that courts have held that disgorgement is designed to be remedial and not punitive. "Disgorgement does not penalize, but merely deprives wrongdoers of ill-gotten gains." *CFTC v. Hunt,* 591 F.2d 1211, 1222 (7th Cir.1979), *cert. denied,* 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979). In other words, the law mandates that in actions for equitable relief, punitive remedies should be imposed only as a last resort.

■ It is well recognized that a court may order the divestment of the benefits of unlawful activity. A number of courts have held that district courts have the power to order disgorgement as a remedy for violations of the Act for "the purpose of depriving the wrongdoer of his ill-gotten gains and deterring violations of the law." *CFTC v. British Am. Commodity Options Corp.,* 788 F.2d 92, 94 (2d Cir.1986), *cert. denied,* 479 U.S. 853, 107 S.Ct. 186, 93 L.Ed.2d 120 (1986). The district court did not err in imposing the ancillary relief of disgorgement. Nevertheless, the question

**9.** Before its use in the Commodity Exchange Act context, disgorgement was used as an equitable remedy in injunctive actions brought under the Securities Exchange Act. Section 27 of the Securities Exchange Act grants the courts equitable powers to enforce that Act. Though the Commodity Exchange Act has no provision similar to section 27, courts have found support for disgorgement in CFTC actions by relying on the general equity power of the federal courts. Moreover, the rationale supporting disgorgement in actions under the securities laws—that allowing a violator to retain the profits from his violations would frustrate the purposes of the regulatory scheme, *see e.g., SEC v. Texas Gulf Sulphur Co.,* 446 F.2d 1301, 1308 (2d Cir.), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 562, 30 L.Ed.2d 558 (1971)—holds true in the context of the Commodity Exchange Act.

remains whether the court erred in its method of determining the amount that had to be disgorged. The district court did not attempt to hold a hearing in which it could take evidence from the parties about the amounts which were illegally received by the defendants. Neither did the court conduct a hearing to determine whether the plaintiffs would have difficulty in proving the amounts that the defendants had illegally obtained. Instead, it simply made its own determination that it would be difficult or impossible for the plaintiffs to prove the amount of ill-gotten profit received by the defendants. The district court choose, as the remedy it would apply, to require the defendants to repay the amounts lost by the customers who had invested in the EBP contracts. This remedy is one which the Second Circuit had imposed in a case where evidence of retained profits could not be developed. *See CFTC v. American Bd. of Trade, Inc.*, 803 F.2d 1242, 1243 (2d Cir.1986).

In *American Board of Trade,* the Second Circuit held that, where defendants' record keeping has "so obscured matters that lawful gains cannot be distinguished from the unlawful without incurring inordinate expense, it is well within the district court's power to rule that the measurement of disgorgement will be the more readily measurable amount of losses incurred by the defendants' customers in the unlawful transactions." *Id.* at 1252.

Without holding a hearing, however, the district court here had no basis upon which to conclude that it would be inordinately difficult to measure unlawful profits.[10] There was no showing that Maxwell kept poor business records or purposely obscured his records. Indeed, Maxwell points out that the plaintiffs themselves took the position in their summary judgment briefs that a hearing was a necessary prerequisite to any disgorgement order. Additionally, Maxwell asserts that the accounting firm which the court appointed to assist the receiver was able to calculate a figure for the illegal gains.[11]

In response, the plaintiffs contend that the accountant's March 1988 report was not complete or final, that Maxwell interposed a host of procedural obstacles which prevented the receiver from making an accurate accounting of the benefits Maxwell received from the unlawful acts alleged in the amended complaint, and that Maxwell resolved these accounting questions only on the eve of the district court's grant of partial summary judgment. The plaintiffs argue that it was Maxwell's failure to come forward in a prompt fashion with the financial details of his involvement with AME and ARC that prompted the district court to compare this action to *American Board of Trade* and to impose the same punitive remedy ordered in that action.

**10.** Appellant argues that the measure of disgorgement should be unlawful "profits." Appellees argue that the measure should be unlawful "proceeds." The term most frequently used in reported decisions appears to be "profits." *See, e.g., CFTC v. American Bd. of Trade*, 803 F.2d at 1252; *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C.Cir.1989). The cases cited by appellees to demonstrate that there is a difference between "profits" and "proceeds" are not helpful in determining whether there is a significant difference between the terms when designating the amount of disgorgement of unjust enrichment. *See, SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1105 (2d Cir.1972) (case cited by appellees to support disgorgement of "proceeds" rather than of "profits"; this case holds that the district court improperly ordered disgorgement not only of proceeds but of the profits which defendant had earned on its proceeds; "we reverse that part of the court's order which provides for disgorgement of the profits and income earned on the proceeds, and remand to the district court for modification of its order so as to require appellants to transfer to the trustee only the proceeds received in connection with the Manor offering, together with interest …").

**11.** The accountant's report concludes that Maxwell's illegal gains from AME's operations were $797,402, far less than the $15 million the court ordered disgorged. The accountants' report also indicates that Maxwell paid $729,304 to AME. The parties dispute the meaning of these payments. Plaintiffs insist that these funds were repayments for monies lent to Maxwell. Maxwell asserts that the funds he paid into the business represent a capital infusion which the company needed to pay its debts to customers and that his maximum gain from the operations was at most the disputed $797,402 figure or, taking into account his payments to AME, $797,402 less $729,304 or $68,098.

Although Maxwell may not have been sufficiently forthcoming with the financial information that the district court requested, we hold nonetheless that it was an abuse of discretion for the district court to fail to hold a hearing prior to ordering disgorgement in an amount equal to investor losses. An important element in our arriving at this conclusion is the fact that the plaintiffs never claimed that Maxwell's ill-gotten gains could not be measured. The court should not have presumed without holding a hearing that the illegal profits could not have been assessed.

Moreover, we agree with Maxwell that any relief ancillary to the injunction sought under the Act must be remedial and not punitive in nature. When used as a remedy, disgorgement of ill-gotten gains prevents those who violate the Commodity Exchange Act from profiting from their wrongs. On the other hand, an award of damages in the amount of investor losses may go beyond the scope of a Commodity Exchange Act enforcement proceeding. Absent a hearing to calculate ill-gotten gains, the disgorgement ordered in an amount equal to investor losses could be a penalty assessment. If investors wish to seek recovery of their losses as a remedy, they are free to do so in an independent civil action against defendants. The hardship of investor losses should not, however, be used as an excuse to impose a remedy under circumstances in which the scope of relief falls outside that remedy's recognized parameters. We will remand the case to the district court for an evidentiary hearing to determine whether an appropriate evaluation can be made of the unlawful profits Maxwell garnered from his involvement with AME and ARC.[12] *Accord CFTC v. Hunt*, 591 F.2d at 1223 (case remanded to district court to give the Commission the opportunity to present arguments and evi-

dence regarding the feasibility of disgorgement).

On remand, the district court, in reconsidering disgorgement, should also keep in mind that any reliance on the decision in *American Board of Trade*, ordering disgorgement in the full amount of the investors' losses, may present a problem in the present case which did not arise in *American Board of Trade*. There, the customers' losses were less than one third of the CFTC's "conservative" analysis of the defendants' profits. 803 F.2d at 1251. Therefore, the amount of disgorgement measured by investor profits did not exceed the amount of unlawful gains. Here, however, according to the appellant's calculations, the total losses may be twenty times or more the amount of Maxwell's unlawful gains. Moreover, there is no indication in the record of the amount of the unlawful gains of the other defendants nor is there any indication that the district court considered whether there would be difficulty in establishing that amount.[13] Maxwell argues that computing the unjust enrichment is a prerequisite of any disgorgement order. We agree that the district court must hold a hearing either to determine the amount of unjust enrichment or to establish that that amount cannot be reasonably approximated.

Until the amount of unjust enrichment has been established by a hearing, there will have been no showing of the relationship of all the defendants' gains to investor losses. The reason why this relationship has to be established is because, as we have already noted, in designing remedies under the Commodity Exchange Act or the Securities Exchange Act, the courts have considered disgorgement to serve primarily to prevent unjust enrichment. For this reason a "court may exercise its equitable power only over the property causally re-

---

12. The appellees also argue that, even if Maxwell were not held liable to disgorge the investors' losses, he could still be held liable as a controlling person under § 13(b) of the Act, as amended, 7 U.S.C. § 13c(b), for the investors' losses caused by other defendants he controlled directly or indirectly. This issue was not raised in the district court and we will not consider it on this appeal. *See United States v. Lowell*, 649

F.2d 950, 966 n. 26 (3d Cir.1981); *Edwards v. Hurtel*, 724 F.2d 689 (8th Cir.1984).

13. The CFTC argues that the defendants have not contested the amount of investor losses. This is true, but the amount of investor losses is a different issue than the amount of the defendants' unjust enrichment.

lated to the wrongdoing." *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C.Cir.1989). In *First City*, the court pointed out that this rule required the SEC to distinguish between "legally and illegally obtained profits." *Id.* We conclude this rule would similarly require a correlation between investor losses and unlawful gains as long as the former is to be used as the measure for disgorgement. This determination is consistent with the concept that "disgorgement may not be used punitively." *Id.* In crafting any disgorgement remedy on remand, the district court should keep in mind the limitation placed on its equitable powers by this requirement that there be a relationship between the amount of disgorgement and the amount of ill-gotten gain.

In its ruling on disgorgement, the district court also held Maxwell, along with the other defendants, jointly and severally liable for the $15 million in customer losses. Because we are remanding this case for a hearing on the amount of disgorgement which Maxwell should be ordered to make, it is not necessary to consider the issue of joint and several liability at this time. Depending upon the outcome of the hearing, the district court can, when it makes a further order on disgorgement, make an appropriate ruling on the question of whether the defendants should be held to be jointly and severally liable for that disgorgement.

### C.

The district court has also frozen all of Maxwell's assets. Maxwell does not argue that the freeze is impermissible. Instead, he contends that the district court should have entered a partial freeze and not a total one. Maxwell urges that this Court's precedents compel that any asset freeze be reasonably related to the likely size of the final judgment. *See Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 198–99 (3d Cir.1990). Drawing on the argument that disgorgement in an amount equal to investor losses was a punitive remedy. Maxwell contends that the "total" freeze now in place is wholly disproportion-

ate to any appropriate disgorgement order the district court can properly issue after it considers the evidence on ill-gotten gains. However, until the district court has had an opportunity to determine whether Maxwell's ill-gotten gains can be quantified, it is premature to consider the propriety of the extent of the asset freeze. Because a freeze is designed to preserve the status quo by preventing the dissipation and diversion of assets, *see CFTC v. Co Petro Mktg. Group, Inc.*, 680 F.2d 573, 582–83 (9th Cir.1982), we will allow the freeze to remain in effect until the district court determines whether it can make an informed determination of the amount of unlawful proceeds retained by Maxwell, and, if it can, what that amount may approximate. The district court can then decide to maintain, remove or modify the freeze.

Maxwell also objects to the district court's decision to deny his request to pay his attorneys' fees out of his frozen assets. He asserts that the court's decision has rendered the freeze order especially draconian. The award of fees in a receivership is entrusted to the discretion of the district court. *SEC v. Capital Counsellors, Inc.*, 512 F.2d 654 (2d Cir.1975). The district court's opinions suggest that the court believes Maxwell has access to additional sources of money. The court denied his request for $7,400 per month to pay his mortgage, noting that the mortgage had been satisfied without the release of frozen funds. The district court also has not allowed Maxwell to pay his son's college tuition. The district court has, however, modified the freeze where circumstances warrant; for example, it has allowed Maxwell $1,355 per month to reflect sufficiently documented expenses for utilities, taxes, insurance, and clothing.

While we recognize that Maxwell's lawyers should be reimbursed for their efforts on his behalf, we do not find the district court's failure to disturb the freeze order to be an abuse of discretion. First, plaintiffs have shown that Maxwell has had access to funds, not covered by the freeze, which he has used to pay some legal fees. Second, Maxwell has been slow to produce

his financial records to the court. Lastly, Maxwell's current attorneys entered their appearance after Maxwell's assets were already frozen and thus should have recognized that there might be some delay in obtaining reimbursement for services rendered.

### D.

Finally, we must address Maxwell's contention that the district court erroneously relied on its factual findings from the preliminary injunction hearing in granting summary judgment. The district court first granted summary judgment in favor of the plaintiffs and against all the defendants on Count I of the amended complaint. That count alleged that the defendants were engaged in the sale of illegal, off-exchange futures contracts in violation of the Act. After further discovery and briefing, the court granted summary judgment to the plaintiffs on Counts II through VIII of the amended complaint. These counts alleged various fraud and securities law violations under the Act, the New Jersey Uniform Securities Law and the Florida Investor Protection Act.[14] On both occasions, the district court made findings that the undisputed facts showed that Maxwell controlled AME and ARC and had significant involvement in the affairs of both firms. The court further determined that it was undisputed that ARC liquidated virtually all of the futures contracts on behalf of AME and that the very existence of ARC was integral to the defendants' offer and sale of futures contracts to the public. The court also concluded that Maxwell's affidavit and unsworn affidavit failed to proffer specific facts to the contrary.

Maxwell contends that the district court relied extensively on its findings from the preliminary injunction hearing in granting the plaintiffs' motions for summary judgment. He is willing to concede that the other defendants did commit the violations charged. He takes exception, however, to the district court's conclusion that, because he controlled Anglo Swiss, AME, and ARC, he should be held liable along with the other defendants. He asserts that, in granting summary judgment against him, the district court improperly relied on factual determinations which it had made in granting the preliminary injunction. He also claims that in rejecting his deposition testimony and affidavits, the district court resolved essential credibility determinations in favor of the plaintiffs' witnesses. On this point, Maxwell declares that his own affidavits and testimony created genuine factual disputes sufficient to defeat the plaintiffs' motions for summary judgment. For these reasons, Maxwell urges this court to reverse the orders granting summary judgment and remand the action for a full trial on the merits.

Plaintiffs, on the other hand, claim that summary judgment was entirely proper because the facts are so one-sided that a trier of fact could not reasonably have found against the moving party. Moreover, the plaintiffs assert that Maxwell's affidavit in opposition to summary judgment amounts to no more than a conclusory denial of liability and does not create a genuine dispute of material fact.

■ This court has plenary power to determine whether the district court properly concluded that no genuine issues of material fact remained for trial and that the plaintiffs were entitled to judgment as a matter of law. *See Little v. MGIC Indem. Corp.*, 836 F.2d 789, 792 (3d Cir.1987). The district court, however, in considering whether there were genuine issues of material fact in connection with the motions for summary judgment, could not rely on credibility findings it made in connection with granting the preliminary injunction. *Country Floors v. Partnership of Gepner and Ford*, 930 F.2d 1056, 1061–63 (3d Cir. 1991).

The district court did refer on occasion to its findings in its preliminary injunction opinion to support its summary judgment determination. For example, in granting summary judgment against Maxwell on Count III of the amended complaint, which asserted that the EBP constituted the offer

---

**14.** *See* note 7 *supra.*

or sale of unregistered, non-exempt securities in New Jersey, the court reiterated its previous finding from the preliminary injunction hearing that Maxwell made the ultimate decision as to the contents and design of the AME brochure that was used to promote the Equity Building Program and given to all potential investors. *See CFTC v. American Metals Exch. Corp.*, 775 F.Supp. 767, 781 (D.N.J.1991) (citing *CFTC v. American Metals Exch. Corp.*, 693 F.Supp. at 179). This reference to the preliminary injunction opinion is, however, not necessary to establish uncontroverted facts sufficient to support summary judgment on Count III, the claim that Maxwell sold unregistered securities in New Jersey. Those facts included Maxwell's guilty plea to the charge of selling an unregistered security in violation of New Jersey law, his statements during his allocution in New Jersey that he knew AME was selling the Equity Building Program contracts in New Jersey and was not registered to do so, and his failure to contest in state court that an Equity Building Program contract was a security.

Maxwell also points to the district court's reliance on evidence submitted at the preliminary injunction hearing and the testimony of Michael Jebrock in concluding that Maxwell controlled AME. On Count II of the amended complaint, the court held that Maxwell's control of Anglo–Swiss, AME, and ARC established the necessary scienter to find Maxwell liable under section 4b(A) of the Act, which makes it unlawful for any person to deceive or defraud any other person in connection with making a contract for the sale of any commodity for future delivery. Maxwell contends that in making this determination, the district court improperly weighed the evidence rather than recognizing the genuine issues of fact which Maxwell raised. Maxwell argues further that the court weighed the credibility of the deponents and found Jebrock's testimony more credible than Maxwell's.[15]

Yet, even without relying on Jebrock's testimony, the court had a large amount of other uncontradicted evidence on which to rest its determination. This evidence included the statements of Carol Kahan, Maxwell's assistant at Amalgamated, that Maxwell required her to contact AME on a daily basis regarding the closing prices on the metals market, AME's sales figures, the value of the contracts sold, and the amount of monies AME received from investors. Moreover, the record shows Maxwell received substantial, documented loans from AME out of funds that should have been invested for the purchase of metals. Maxwell also wrote a letter to Bill Frank in which he stated that all memos to AME were to be sent in draft form to Maxwell's office for approval.

 Moreover, even if we were to conclude that the district court improperly included credibility determinations, made in connection with the preliminary injunction hearing, in its granting of summary judgment, we can still affirm the district court's decision if the record nevertheless demonstrates the absence of any genuine issue of material fact. *Country Floors*, 930 F.2d at 1063.

In addressing the summary judgment arguments, it is important to note that Maxwell pled guilty to one count of violating New Jersey law by selling an unregistered security and pled no contest to two violations of Florida law. When he entered his guilty plea in the New Jersey Superior Court, he admitted his involvement with AME and EBP:

I was involved as an active investor in American Metals Exchange which sold investment contracts and precious metals; it was known as the Equity Building Program. I was aware that American Metals Exchange sold the program in New Jersey into June of 1987 from May of 1986. I was aware that the program was not registered with the State of New Jersey. I was aware that several other states had ordered cease and desist or-

---

**15.** Defendant Michael Jebrock testified that Maxwell controlled AME and that all management, accounting, and legal decisions pertaining to AME were supposed to be made in Maxwell's offices.

ders against the Equity Building Program alleging violations of their Blue Sky laws. I also knew that American Metals Exchange had a direct relationship with Amalgamated Redemption Center, and I do not dispute the State's position that the Equity Building Program was a security.

Joint Appendix at 1436–37.

His guilty plea in New Jersey contradicts Maxwell's conclusory denials of any participation in AME, of any involvement in the offer and sale of the EBP, and of any appreciation of the relationship between AME and ARC. Moreover, in his affidavits Maxwell does not dispute the majority of the facts detailed in the statements of Wallach, Jebrock, Kahan, and Frank. When the admissions made at the plea colloquy are viewed together with the other uncontested evidence in the record, there is sufficient uncontroverted evidence to affirm the grant of summary judgment on all counts.

### III.

For the above reasons, we will affirm the orders of the district court granting the motions for summary judgment, we will vacate the orders holding the defendants jointly and severally liable to disgorge ill-gotten gains in an amount equal to investor losses, and we will remand the case to the district court for further proceedings consistent with this opinion.