**STEINHARDT GROUP INC.; C.B. Mtge., L.P.; BHT Limited, L.P.**

v.

**CITICORP; Citibank, N.A.; Citicorp North America, Inc.; Citicorp Securities, Inc.; Citicorp Mortgage, Inc.; BGO, Inc.**

and

*Bristol Oaks, L.P.; BHT Limited, L.P.; The Steinhardt Group Inc.; C.B. Mtge., L.P., in their own right; C.B. Mtge., L.P., derivatively on behalf of Bristol Oaks, L.P.; BHT Limited, L.P., Appellants.

No. 96–7757.

United States Court of Appeals, Third Circuit.

Argued July 24, 1997.

Decided Sept. 12, 1997.

Lawrence C. Ashby, Ashby & Geddes, Wilmington, DE, Douglas S. Eakeley (argued), Lowenstein, Sandler, Kohl, Fisher & Boyland, Roseland, NJ, for Appellants.

Martin P. Tully, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, R. Paul Wickes (argued), James R. Warnot, Jr., Steven M.

*.Amended per clerk's order of 1/22/97.

Davidoff, Kathryn E. Clearfield, Shearman & Sterling, New York City, for Appellees Citicorp; Citibank, N.A.; Citicorp North America, Inc.; Citicorp Securities, Inc.; Citicorp Mortgage, Inc.

James H. Hulme, Marc A. Tenenbaum, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, for Appellee BGO, Inc.

Before: BECKER and MANSMANN, Circuit Judges, and HOEVELER, District Judge.**

MANSMANN, Circuit Judge.

In this appeal, we are asked to decide whether a highly structured securitization transaction negotiated between Citicorp and an investor in a limited partnership constitutes an "investment contract" as that term is defined by the Supreme Court in *SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). Examining the economic reality of the transaction as a whole, we conclude that the limited partner retained pervasive control over its investment in the limited partnership such that it cannot be deemed a passive investor under *Howey* and its progeny. Accordingly, we find the securitization transaction here does not constitute an investment contract. We will, therefore, affirm the judgment of the district court.

## I.

This case comes before us on review of the district court's order granting the Citicorp Defendants' motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6). When reviewing such an order, we

are required to accept as true the factual allegations in the complaint. *D.R. v. Middle Bucks Area Vocational Technical School,* 972 F.2d 1364, 1367 (3d Cir.1992) (citation omitted); *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988). In considering a rule 12(b)(6) motion, "a court may consider an undisputably authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guaranty Corp. v. White Consolidated Industries, Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993) (citations omitted). Thus, the facts as set forth in the amended complaint and the relevant portions of the defendants' exhibits[1] are summarized below.

### A.

The controversy here arises out of alleged violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and 78t(b), and Rule 10b5, 17 C.F.R. § 240.10b–5 involving the "securitization" of a pool of delinquent residential mortgage loans ("Mortgage Loans") and real estate owned by Citicorp as a result of foreclosed loans ("REO").[2] The plaintiffs are The Steinhardt Group Inc. ("Steinhardt Group") and C.B. Mtge., L.P. ("C.B.Mtge."). The Steinhardt Group is a Delaware investment firm with its main office in New York City. C.B. Mtge., an affiliate of the Steinhardt Group, is organized as a Delaware limited partnership and holds a 98.79% interest as a limited partner in the Bristol Oaks, L.P. ("Bristol" or "Partnership"). Together, the Steinhardt Group and C.B. Mtge. are collectively referred to as "Steinhardt."

** Honorable William M. Hoeveler of the United States District Court for the Southern District of Florida, sitting by designation.

1. In support of its Motion to Dismiss, the defendants attached copies of the May 26, 1994 Letter Agreement between Citicorp and Steinhardt; the June 30, 1994 Mortgage Loan and REO Property Sale Agreement between Bristol Oaks, L.P., BHT, and Citibank; the Bristol Oaks Limited Partnership Agreement dated June 30, 1994 between BGO, C.B. Mtge., and OLS; and the June 30, 1994 Service Agreement between Bristol Oaks, BHT, and Ontra, Inc.

2. In addition to violations of federal securities laws, the amended complaint alleges common

law fraud and breach of express and implied contractual obligations. The plaintiffs also assert derivative claims under Delaware law against the Citicorp Defendants on behalf of Bristol Oaks, L.P. and BHT Limited, L.P., the limited partnerships in which Steinhardt had invested. The plaintiffs sought to invoke the district court's supplemental jurisdiction under 28 U.S.C. § 1367(a) over these state law claims. Inasmuch as the plaintiffs have failed to state a federal claim under rule 12(b)(6), we find that no basis exists for retaining supplemental jurisdiction over the state law claims. Accordingly, the district court properly declined to exercise supplemental jurisdiction over the state law claims.

Bristol Oaks is a limited partnership formed under the laws of the state of Delaware for the express purpose of creating an investment vehicle for issuing debt and equity securities to investors. Bristol is made up of one general partner, BGO, Inc. (1% ownership interest), and two limited partners, C.B. Mtge., L.P. (98.79% ownership interest), and OLS, Inc. (.21% ownership interest).

The Citicorp Defendants are comprised of Citibank, N.A., a national banking association, Citicorp North America, Inc. ("CNAI"), Citicorp Securities, Inc. ("CSI"), Citicorp Mortgage, Inc. ("CMI"), and Citicorp, which controls either directly or indirectly the other Citicorp Defendants. With the exception of Citibank, all of the Citicorp Defendants are organized under the laws of the state of Delaware.

Also named as a defendant in this action is BGO, Inc. ("BGO"), a Texas corporation and the general partner of Bristol. BGO is 100% owned by Ontra, Inc. ("Ontra"). Bristol contracted with Ontra to provide loan servicing, loan workouts, REO sales, and oversight of these asset types to the Partnership. The claims against BGO concern its refusal of Steinhardt's demand that BGO file suit on behalf of the Partnership against the Citicorp Defendants.

Named as nominal defendants are Bristol and BHT Limited, L.P. ("BHT"), a Delaware limited partnership, which is owned 99% by Bristol. Not parties to this lawsuit are OLS, Inc., an Ontra affiliate owning a .21% limited partner interest in Bristol and BHT, Inc., an Ontra affiliate and 1% general partner in BHT Limited, L.P.

The fraudulent conduct alleged in the amended complaint arises out of a severe financial crisis faced by Citicorp during the early 1990's. With bad loans and illiquid assets threatening the very existence of the nation's then-largest banking institution, Citicorp was looking for a way to extricate itself from its financial problems. The securitization transaction was thus conceived by Citicorp to remove the nonperforming assets from its financial books and replace them with cash.

In essence, the securitization required Citicorp to create an investment vehicle—a limited partnership ultimately named Bristol Oaks, L.P.—that would issue both debt securities, in the form of nonrecourse bonds, and equity securities, in the form of partnership interests, to investors. Bristol would acquire title to the nonperforming Mortgage Loans and REO properties and would retain Ontra, Inc. to manage and liquidate the assets. Then Bristol would obtain bridge financing from Citibank and CNAI; shortly thereafter, CSI would securitize and underwrite a public offering of bonds and other debt securities to pay off the bridge financing. All of the investors' money was to be paid to Bristol and become the capital of that investment vehicle. The return on these investments was to come from the same pool of assets.

During late 1993 and the first half of 1994, representatives of CSI made a series of written and oral presentations to the Steinhardt Group in which they described returns of 18% or more annually by investing in Bristol. Throughout these presentations and in other meetings and telephone discussions, Citicorp explained how it had created the proprietary "Citicorp Non–Performing Loan Model" (the "Pricing Model"), based on its own past experience, intimate knowledge of the assets at issue, and the valuation of such assets. Citicorp represented the Pricing Model to be an accurate means of pricing the Mortgage Loans and REO properties in the portfolio and of providing the Steinhardt Group with the promised 18% or greater returns. In particular, Citicorp represented to the Steinhardt Group that no institution in America had more experience in single-family residential mortgages, or more knowledge about the process of collecting on defaulted mortgage loans. Moreover, Citicorp touted not only its longstanding reputation in the banking industry, but also how the assumptions in the Pricing Model were firmly grounded upon Citicorp's own unparalleled experience and expertise.

A series of factual assumptions lies at the core of the Pricing Model. First, Citicorp assumed that the most accurate "proxy" for the values of the REO and the properties mortgaged for the Mortgage Loans would be

Broker's Price Opinions ("BPOs"). These BPOs would be obtained from independent real estate brokers reflecting collateral value as well as the proceeds that would be obtained within six months if the properties were listed for sale. In addition, these BPOs were to provide "as is" values indicating what the properties were worth in light of their overall exterior and interior physical condition. Finally, an integral component of Citicorp's valuation methodology was obtaining BPOs for all of the assets, rather than just a sampling, thereby resulting in a more accurate valuation of the portfolio and significantly reducing the investment risk.

Under the Pricing Model, Citicorp represented the BPOs would be used to calculate a current Loan–to–Value ("LTV") ratio for each of the properties. The LTV ratio was used to project the probability of possible outcomes with respect to each of the Mortgage Loans, as well as the ultimate cash proceeds that would flow from each of the possible resolutions.[3] The Pricing Model further assumed that each of the existing and to-be-foreclosed REO properties could be sold for 98% of the BPO, which Citicorp represented to be conservative and designed to assure realization of its promised 18% return on the portfolio.

The Pricing Model also assumed that Ontra, as service-provider, would be able to resell the reinstated Mortgage Loans through a pre-existing "conduit" for such loans developed by Citicorp. Citicorp expressly stated in its written presentations to Steinhardt that the Pricing Model's assumptions were predicated on Citicorp creating a market in these loans to facilitate the stated time frames. Without such a conduit, Bristol could be left without an existing method to dispose of reinstated loans, with little choice but to foreclose on these Mortgage Loans, and holding reinstated loans for up to 30 years, negating the possibility of receiving an attractive resale price within six months as the Pricing Model assumed.

Citicorp further represented that CMI, in the past, had made little or no attempt to collect a substantial number of the delin-

quent Mortgage Loans and, thus, estimated that 45% of the total portfolio collections could be quickly restructured or worked out through payoffs or settlements.

Finally, based on its own experience, Citicorp included several other assumptions in the Pricing Model: the average cost of repairs and maintenance for each of the properties in its portfolio would be $1,000; the foreclosures would take an average of less than nine months at an average cost of $2,500; the time required for collection on the Mortgage Loans or foreclosure would not be delayed by future bankruptcy filings.

According to the amended complaint, Citicorp knew at the time it made these representations that several of the assumptions underlying the Pricing Model were false. Steinhardt claims that Citicorp obtained inflated valuations by promising the brokers they would later be hired to list the properties for sale if the BPOs were satisfactory to Citicorp. The inflated valuations, in turn, caused the assets to be overpriced, which resulted in the overstatement of future cash flow. Steinhardt further contends that CMI failed to follow its own internal controls for insuring unbiased appraisals, that it employed brokers not on Citicorp's approved list, and that it required brokers to provide large numbers of valuations within grossly inadequate periods of time, which further undermined their accuracy. Although Citicorp was allegedly warned repeatedly by one of its own officers that the assets were overpriced, these warnings were never revealed to Steinhardt. Rather, Steinhardt contends these warnings were actively concealed in order to induce it to invest in Bristol.

According to the amended complaint, Citicorp concealed other information from Steinhardt, including the true cost of repairs and maintenance, low-end BPOs and other appraisals, recent appraisals which reflected the decline in the real estate market, the true cost and time for foreclosures, the true likelihood of delays caused by bankruptcy proceedings, and Citicorp's intention not to provide a conduit for the sale of reinstated loans.

---

**3.** Possible outcomes with respect to the Mortgage Loans include the probability that the loan would be reinstated, worked out with a discounted payment, or foreclosed.

Steinhardt claims that "[t]he cumulative effect of all these misrepresentations by Citicorp was to fraudulently inflate the purchase price for the entire portfolio."

Based on Citicorp's representations, Steinhardt entered into a letter agreement dated May 26, 1994, with CSI, Citibank, CNAI, and Citicorp (the "Letter Agreement"), in which it committed to make an equity contribution of between $40 and $45 million in Bristol. According to the Letter Agreement, a portfolio of approximately $540 million to $660 million in Mortgage Loans and REO properties was to be sold by Citibank and CNAI to a newly formed limited partnership, Bristol. To fund the acquisition of the properties, Citibank and CNAI agreed to lend the newly formed partnership no less than 90% of the total purchase price; the remaining 10% was to be provided by the Partnership in the form of a cash payment representing the Partnership's total equity. Subsequently, debt securities were to be issued by the Partnership and underwritten by CSI to repay the Citibank and CNAI loans.

The Letter Agreement further provided that "[t]he Partnership will contract with Ontra, Inc ...., an independent third party who is experienced in loan servicing, loan workouts, REO sales, and oversight of these asset types", to service the properties.[4] An affiliate of Ontra, BGO, was named the general partner of the new limited partnership in exchange for a 1% equity contribution.

In addition, the Letter Agreement stated that the total purchase price of the assets "will be established to provide the Partners with an internal rate of return ... of 18%

based on the agreed-to assumptions ... and methodology, subject to the satisfaction of Steinhardt's conditions...." One of these conditions was the receipt by Steinhardt of an unqualified "comfort letter," issued by a nationally recognized, big six, accounting firm, and which verified, without qualification, the validity of Citicorp's assumptions and methodology.

With regard to the issuance of debt securities, the Letter Agreement provided that CSI shall either underwrite the securities on a firm commitment basis or place the securities on a best efforts basis. In either event, Citibank and CNAI were to bear all of the costs, expenses and fees incurred in connection with the issuance of the securities. Under the Letter Agreement, the debt securities were the general obligation of the Partnership with recourse solely to the assets. Initially, the proceeds of the securitization were to be used to repay outstanding principal and accrued interest on the notes. Although CSI determined the structure of the securitization, Steinhardt had approval rights, and the economic and other terms of the debt securities were not to be established in any manner which adversely affected Steinhardt's return on its investments.

The first step of the securitization transaction was completed in the early part of July, 1994, in accordance with two Sale Agreements dated June 30, 1994.[5] Pursuant to the Sale Agreements, Bristol and BHT purchased approximately 3,100 Mortgage Loans and 900 REO properties from Citibank and CNAI for close to $415 million.[6] Bristol

---

4. In the amended complaint, Steinhardt claims that at the time the Letter Agreement was executed, Citicorp was already negotiating a "lock up" agreement with Ontra, whereby Citicorp was to have a right of first refusal on all of Ontra's assets and stock as well as "the power to limit Ontra's servicing solely to Citicorp's portfolios and the portfolio at issue...." Thus, Steinhardt contends, Ontra was never the independent third party the Citicorp Defendants represented it to be.

5. The Limited Partnership Agreement was also executed on June 30, 1994.

6. In the Sale Agreement, Bristol and BHT, collectively the Purchaser, represented and warranted to the Seller that it:

is a sophisticated investor and its bid and decision to purchase the Mortgage Loans and REO properties is based upon its own independent expert evaluations of the Mortgage File, the REO File and other materials made available by the Seller and deemed relevant by the Purchaser ... The Purchaser has not relied in entering into this Agreement upon any oral or written information from the Seller, or any of its respective employees, affiliates, agents or representatives, other than the representations and warranties of the Seller contained herein.... [T]he Seller has made no representations or warranties as to the Mortgage Loans and REO Properties (including without limitation, the value, marketability, condition or future performance thereof, ... )

purchased all of the assets except the New York REOs, which were acquired by BHT. C.B. Mtge. invested $42 million in Bristol and acquired a 98.79% limited partner interest.

Also contained in the Sale Agreements were numerous express representations and warranties made by Citibank and CNAI relating to the Mortgage Loans and REO properties which Steinhardt claims were breached. In particular, sections 6(a)(1) and 6(b)(1) contained assurances that "[t]he information set forth in the Mortgage Loan and REO Property Schedule is true and correct in all material respects as of the date ... such information is furnished". The Schedule was required to contain the latest appraised values of each Mortgage Loan and REO property. Instead of providing the latest appraised values as required by the agreements, Citibank and CNAI utilized, on over 2,300 of the assets at issue, appraised values obtained years earlier, at the time of loan origination, which failed to take into consideration declines in the real estate market. Consequently, Steinhardt contends, Citibank's misrepresentation caused the assets to be overvalued by at least 25%.

According to the amended complaint, Citibank and CNAI breached other specific representations and warranties contained in the Sale Agreements, including "warranties as to their conveyance of good title, the nonexistence of liens, compliance with zoning regulations and other applicable laws, the absence of any environmental violations, and the absence of any valid offset or defense to foreclosure, . . .", among others.

Section 8 of the Sale Agreement sets forth specific remedies for breach of the representations and warranties. Upon notice of any breach of a representation or warranty, the Seller has thirty days to "use its best efforts promptly to cure such breach in all material respects...." If the Seller fails to do so, then, at the Purchaser's option, the Seller

shall repurchase such Mortgage Loan or REO Property at the repurchase price. In addition to the repurchase remedy, the Seller is also required to indemnify and hold harmless the Purchaser against any losses, damages, penalties, fines, forfeitures, legal fees, judgments, and other costs and expenses arising from any claims resulting from the Seller's breach. The parties agreed that the above remedies "constitute[d] the sole remedies of the Purchaser respecting a breach of the foregoing representations and warranties."[7]

On December 14, 1994, the second step of securitization transaction was completed with the issuance of the debt securities. According to Steinhardt, Citicorp controlled every aspect of the securitization by: structuring all aspects of the securitization; drafting the prospectus; leading all material discussions with the rating agencies; acting as the sole underwriter for the issuance of the debt securities; separately indemnifying Bristol and its affiliates; purchasing an interest rate cap to minimize the risk of any changes in the variable interest rates; arranging for credit enhancement; paying for all of the expenses of securitization; in lieu of customary underwriter's fees, applying the proceeds of the securitization to pay off the bridge loans; and reimbursing Bristol for additional operating expenses resulting from the securitization.

According to the amended complaint, Steinhardt first learned of Citicorp's allegedly fraudulent scheme in 1995 through conversations with a former officer of CMI, which ultimately led to an investigation and the discovery of the alleged fraud. On December 1, 1995,[8] Bristol and BHT (collectively the "Partnerships"), sent Citibank and CNAI a repurchase notice for more than 2,300 assets; however, Citibank and CNAI refused to honor their obligations to repurchase

---

7. The amended complaint references a letter agreement dated July 6, 1994 in which Citibank and CNAI agreed that Bristol could assign the representations and warranties made under the Sale Agreement to "investors who will invest in the Securities." This letter, however, was not part of the record below.

8. Although paragraph 57 of the amended complaint avers that the notice was sent on December 1, 1995, paragraph 69 alleges that the same notice was sent on November 30, 1995. Since a copy of the notice is not part of the record, we do not know on which date the notice was actually sent. It is of no moment, however, to the issue before us.

these assets. In addition to ignoring their repurchase obligations, Citibank and CNAI have also failed to reimburse the Partnerships for expenses owed for real estate taxes, legal expenses and vendor expenses; refused to prorate unapplied funds; and failed to produce BPOs for approximately 850 assets. Steinhardt contends that the entire course of conduct of Citibank and CNAI constitutes a total repudiation of the Sale Agreements.

Subsequently, on November 16, 1995, representatives of Steinhardt met with officials of BGO, the general partner of Bristol, to demand that the Partnership commence litigation against the Citicorp Defendants. Despite repeated requests from Steinhardt, BGO has declined to commence legal action on behalf of the Partnership, choosing instead to negotiate, albeit unsuccessfully, with the Citicorp Defendants for over a year and a half. Citicorp has refused to honor the repurchase notice.

### B.

On January 17, 1996, Steinhardt instituted the present action on its own behalf.[9] In response, the Citicorp Defendants filed a Motion to Dismiss the amended complaint under Fed.R.Civ.P. 12(b)(6). The district court granted their motion, ruling that Steinhardt's investment in the limited partnership did not constitute an investment contract as that term is defined in *Howey, supra*. In reaching this conclusion, the district court determined that although Steinhardt was a passive investor, a common enterprise was not established under the facts pleaded. The district court also declined to exercise supplemental jurisdiction over Steinhardt's state law claims, having found that the Citicorp Defendants did not present a predicate for the

court to conclude that it would be serving the interests of fairness and economy by considering the state law claims. BGO moved to dismiss on the basis that the complaint failed to demand any relief from them. The district court ruled that BGO's motion was now moot since the court dismissed Counts I and II of the amended complaint and declined supplemental jurisdiction over the state law claims.

On December 2, 1996, the district court entered a final order granting the Citicorp Defendants' Motion to Dismiss. This timely appeal followed. Our jurisdiction over this appeal arises under 28 U.S.C. § 1291; our review is plenary.

### II.

■ The outcome of this dispute hinges upon whether, under the circumstances, the securitization transaction constitutes an investment contract within the meaning of section 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(a)(1). In order to invoke the protections of the federal securities laws, an investor must show, as a threshold matter, that the instrument in question is a security. Section 2(1) of the Act sets forth the definition of the term "security."[10] Included in this definition are several catch-all categories which were designed to cover other securities interests not specifically enumerated in the statute. *See* Maura K. Monaghan, *An Uncommon State of Confusion: The Common Enterprise Element of Investment Contract Analysis*, 63 Fordham L.Rev. 2135, 2136 (May, 1995). One such category is the "investment contract."

■ The term investment contract has not been defined by Congress, nor does the legis-

---

**9.** The amended complaint upon which our decision rests was filed on January 30, 1996.

**10.** 15 U.S.C. § 77b(a)(1) states:
The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call,

straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

lative history to the 1933 and 1934 Acts illuminate what Congress intended by the term investment contract. The interpretation of this term has thus been left to the judiciary. In 1946, the Supreme Court took up the task of defining the parameters of an investment contract in the seminal case of *SEC v. W.J. Howey*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). The Court stated:

> an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party ...

*Id.* at 298–99, 66 S.Ct. at 1103.[11] Thus, the three requirements for establishing an investment contract are: (1) "an investment of money," (2) "in a common enterprise," (3) "with profits to come solely from the efforts of others." *Id.* at 301, 66 S.Ct. at 1104.

In enunciating this test, the Supreme Court noted that the statutory purpose of compelling full and fair disclosure was fulfilled. *Id.* at 299, 66 S.Ct. at 1103 (citing H. Rep. No. 85, 73d Cong., 1st Sess., p. 11). The Court further observed that this definition "embodie[d] a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* The *Howey* test still predominates in investment contract analysis today.

The facts in *Howey* inform our application of the test here. In *Howey*, the SEC sought to restrain a Florida corporation from offering and selling small tracts of land in a large citrus grove it owned in violation of section 5(a) of the Securities Act of 1933, 15 U.S.C. § 77e(a). The purchasers were offered land sales contracts for small parcels of the grove, along with a service contract for harvesting and marketing the fruit. Although the purchasers were free to contract with other service companies, the superiority of the corpo-

ration's service company was stressed. For the most part, the purchasers lacked the knowledge, skill, and equipment necessary for the care and cultivation of citrus trees. The purchasers had no desire to occupy the land or develop it themselves; they were attracted solely by the prospects of a return on their investments. The purchasers received an allocable share of the profits based on the amount of shares owned. Forty-one persons bought shares in the Florida citrus grove. Based on these facts, the Supreme Court concluded that all of the elements of an investment contract had been met. *Id.* at 299, 66 S.Ct. at 1103.

Clearly Steinhardt has alleged sufficient facts to meet the first prong of *Howey*. The Steinhardt Group, through its affiliate, C.B. Mtge., has invested $42 million dollars in Bristol with the expectation of receiving a return on its investment of approximately 18%. Thus, the facts alleged show that Steinhardt has undertaken some degree of economic risk. Monaghan, *supra*, at 2147 (citing Reves v. *Ernst & Young*, 494 U.S. 56, 67, 110 S.Ct. 945, 952, 108 L.Ed.2d 47 (1990)).

Regarding the second prong, commonality, we have previously applied a horizontal commonality approach in determining whether a particular investment constitutes a security. *See, Salcer v. Merrill Lynch, Pierce, Fenner and Smith*, 682 F.2d 459, 460 (3d Cir.1982). "[H]orizontal commonality requires a pooling of investors' contributions and distribution of profits and losses on a pro-rata basis among investors." *Monaghan, supra*, at 2152–53 (footnotes omitted). In the case before us, Steinhardt maintains that the district court erred in concluding that horizontal commonality was not adequately pleaded. In the alternative, Steinhardt argues that vertical commonality exists here and urges us to find that vertical commonality can satisfy the *Howey* common enterprise prong. On the other hand, the Citicorp Defendants agree with the district court's finding as to the

---

**11.** In *Howey*, the Supreme Court interpreted "security" as defined in section 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1). This definition is, in essence, the equivalent of that contained in the Securities Exchange Act of 1934, 15 U.S.C. § 78c, the statute which is at issue

here. *Tcherepnin v. Knight*, 389 U.S. 332, 342, 88 S.Ct. 548, 556, 19 L.Ed.2d 564 (1967); *Goodwin v. Elkins & Co.*, 730 F.2d 99, 102 n. 5 (3d Cir.1984) (citing *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975)).

common enterprise element but disagree with the court's ruling insofar as it found that the third element of the *Howey* test was adequately pleaded—the "solely from the efforts of others" element. The Citicorp Defendants entreat us to find that Steinhardt negotiated such pervasive control over its investment in Bristol Oaks that it cannot meet the third element of *Howey.*

The district court found that only vertical commonality, and not horizontal commonality, was successfully pleaded in this case. Stating that the court of appeals has not adopted vertical commonality, the district court held that the common enterprise prong of the *Howey* test had not been adequately pleaded in the complaint. We have addressed horizontal commonality only once previously in *Salcer, supra,* where we summarily held the investment was not part of a pooled group of funds. We do not need to consider whether vertical commonality should be adopted here, or whether horizontal community was adequately pleaded, because we believe the third element of *Howey* is dispositive.

The third prong of the Supreme Court's test in *Howey* test requires that the purchaser be attracted to the investment by the prospect of a profit on the investment rather than a desire to use or consume the item purchased. *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 853–54, 95 S.Ct. 2051, 2060–61, 44 L.Ed.2d 621 (1975) (court concluded that sale of shares in a housing cooperative did not give rise to a securities transaction where none of the promotional materials emphasized profit and there was a low probability the shares would actually produce a profit). In analyzing this element, the courts have also looked at whether the investor has meaningfully participated in the management of the partnership in which it has invested such that it has more than minimal control over the investment's performance. Monaghan, *supra,* at 2151.

In *SEC v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476, 482 (9th Cir.1973), the court of appeals stated that the critical inquiry is "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." Our sister court in the fifth circuit, citing *Glenn W. Turner Enterprises, supra,* noted that this inquiry comported with the position adopted by the SEC:

> It must be emphasized that the assignment of nominal or limited responsibilities to the participant does not negative the existence of an investment contract; where the duties assigned are so narrowly circumscribed as to involve little real choice of action or where the duties assigned would in any event have little direct effect upon receipt by the participant of the benefits promised by the promoters, a security may be found to exist. As the Supreme Court has held, emphasis must be placed upon economic reality. *See* Securities and Exchange Commission v. W.J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). . . .

*SEC v. Koscot Interplanetary, Inc.,* 497 F.2d 473, 483 n. 14 (5th Cir.1974) (citing Securities Act Release No. 5211 (Nov. 30, 1971), reported in 1971–72 Transfer Binder CCH Fed.Sec. L.Rep. # 98446).

We cited with approval the test set forth in *Glenn W. Turner Enterprises, supra,* for determining whether the third prong of *Howey* had been met in *Lino v. City Investing Co.,* 487 F.2d 689, 692–93 (3d Cir.1973), where we concluded that franchise licensing agreements did not constitute investment contracts because of the significant efforts of the licensee in promoting the franchise. In so ruling, we were persuaded by the reasoning of the Supreme Court,[12] the Ninth Circuit,[13] the SEC,[14] and the Supreme Court of

---

12. *See Howey, supra,* at 299, 66 S.Ct. at 1103. *Accord, SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 351, 64 S.Ct. 120, 123–24, 88 L.Ed. 88 (1943); *Tcherepnin v. Knight,* 389 U.S. 332, 338, 88 S.Ct. 548, 554, 19 L.Ed.2d 564 (1967).

13. *See SEC v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476 (9th Cir.1973).

14. *See* Securities Act Release No. 5211 (Nov. 30, 1971), reported in 1971–72 Transfer Binder CCH Fed.Sec.L.Rep. # 98446.

Hawaii.[15] *Id.* at 692. Specifically, we noted the Supreme Court's statement in *Howey* that the "definition of a security 'embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.'" *Id.* (quoting *Howey, supra,* at 299, 66 S.Ct. at 1103). We held that "an investment contract can exist where the investor is required to perform some duties, as long as they are nominal or limited and would have 'little direct effect upon receipt by the participant of the benefits promised by the promoters.'" *Id.* (quoting Securities Act Release No. 5211, *supra*). Thus, we refused to read literally the term "solely," as used in the *Howey* test, when evaluating the efforts of the investor. *Id.*

In *Goodwin v. Elkins & Co.,* 730 F.2d 99 (3d Cir.1984), we were asked to consider the "solely from the efforts" requirement in the context of a partnership interest. There we looked to the partnership agreement to determine the amount of control a partner had over the management of a brokerage firm. The plaintiff in *Goodwin* had been a general partner in the defendant brokerage firm for more than 20 years. Dissatisfied with the management policies of the firm, Goodwin resigned but initially agreed to stay until March 31, 1982. In February 1982, he negotiated an agreement with the firm in which he agreed to make his resignation effective January 1, 1982 and the firm represented that no sale or merger of the business was planned. On March 17, 1982, the Elkins firm was sold and merged into another brokerage house which resulted in financial advantages to the general partners. Goodwin sued his firm to recover the difference in the value of his partnership interest on January 1 and March 31, 1982.

Although the panel in *Goodwin* unanimously held that the plaintiff's partnership interest did not qualify as a security under federal securities laws, they disagreed as to whether their examination of the issue should be limited to the partnership agreement. 730 F.2d at 103. Judge Garth reached the result solely by reference to the Pennsylvania Partnership Act.[16] He opined that "Goodwin's interest [did] not qualify as a security primarily because the role of a general partner, *by law,* extends well beyond the permitted role of the passive investor." *Id.* (footnote omitted). In concurring opinions, then-Chief Judge Seitz and Judge Becker limited their examinations to the terms of the partnership agreement in concluding that the general partnership interest did not constitute a security. *Id.* at 112–13. After analyzing the residual powers vested in Goodwin, the panel concluded that he still necessarily enjoyed considerable authority in the operation of the firm such that his interest could not be deemed a security. *Id.* at 107, 113–14. The panel further noted that "whether a partnership interest constitutes a security depends on the *legal* rights and powers enjoyed by the investor." *Id.* at 107.

To resolve the issue of whether Steinhardt's involvement in the Bristol Oaks Limited Partnership was limited to that of a passive investor, we must look at the transaction as a whole, considering the arrangements the parties made for the operation of the investment vehicle[17] in order to determine who exercised control in generating profits for the vehicle. The Limited Partnership Agreement ("LPA"), which establishes the relative powers of the partners in running the enterprise, therefore governs our inquiry.

Section 3.1(f) of the LPA, as amended, requires that "the Managing Partner shall not have the right to take any of the following actions ("Material Actions") without the consent of . . . a Majority of the Partners (or pursuant to an approved Business Plan). . . ." The "Material Actions", set forth in section 3.1(f) of the LPA, include most tasks that are crucial to turning the mortgages and REO into profit, which is the basic purpose of Bristol Oaks, e.g., entering into any written

---

**15.** *See State v. Hawaii Market Center, Inc.,* 52 Haw. 642, 485 P.2d 105 (1971).

**16.** 59 Pa. Cons.Stat. Ann. §§ 301–365 (Purdon Supp.1983).

**17.** The term "investment vehicle" refers to the Bristol Oaks Limited Partnership.

or verbal material agreement or transaction with any borrower outside of the Loan Documents; giving any material consent required to be obtained by any borrower under the Loan Documents; modifying or amending any of the Loan Documents; exercising any rights under the Loan Documents; selling, exchanging, securitizing, conveying, or otherwise voluntarily disposing of, or placing any encumbrance on, the Properties. Under the LPA, a "Majority of the Partners" is defined as "those Partners holding greater than fifty percent (50%) of the Percentage Interests ...", meaning that Steinhardt alone constitutes a "Majority of the Partners."

Steinhardt approved the interim business plan[18] and although Citicorp drafted that plan, Steinhardt retains the power to amend that plan as it wishes in one of two ways: (1) in its capacity as "Majority of the Partners," Steinhardt can propose and approve a new business plan; and (2) if the general partner proposes a new business plan, Steinhardt retains veto power, which it can exercise merely by declining to approve the proposed change within fifteen business days. Thus, we agree with the Citicorp Defendants that "Steinhardt's consent is required for the taking of any 'Material Action,' whether through its control over the business plan, or through its veto power over 'Material Actions' that fall outside the parameters of the business plan."

The LPA further provides that where a Majority of the Partners proposes a Material Action, the general partner "shall use best efforts to implement such Material Action at the Partnership's expense on the terms proposed by such Majority of the Partners," i.e., Steinhardt. If the general partner refuses to act with such best efforts in pursuit of Steinhardt's proposals, Steinhardt can remove and replace the general partner without notice.

As the above provisions demonstrate, the LPA gives Steinhardt pervasive control over the management of the Partnership. Indeed, these quite significant powers are far afield of the typical limited partnership agreement whereby a limited partner leaves the control of the business to the general partners. We find the agreement altogether consistent with the arrangement before us: Steinhardt, a sophisticated investor, made a $42 million capital contribution in Bristol Oaks, thereby becoming a 98.79% partner through a highly negotiated transaction.

Moreover, it appears the parties have carefully constructed the LPA to give Steinhardt significant control without possibly running afoul of the Delaware Revised Uniform Limited Partnership Act, 6 Del. C. § 17–101, *et seq.* Indeed, Steinhardt has proposal and approval rights rather than more affirmative responsibilities. We also find unpersuasive Steinhardt's contention that its powers were limited under the LPA. First, Steinhardt points out language in the LPA that:

[e]xcept for specific rights to propose and approve or disapprove certain Partnership matters as set forth in the Agreement, the Limited Partners shall not take any part whatsoever in, or have any control over, the business or affairs of the Partnership, nor shall the Limited Partners have any right or authority to act for or bind the Partnership.

Section 3.1(g) of the LPA. Given the extensive proposal and approval rights retained by Steinhardt under the LPA, the "except" clause swallows the general rule of nonparticipation. Second, Steinhardt points out that if a business plan was in place, as it was as soon as Steinhardt approved the interim agreement, Steinhardt's approval was not required for the general partner to take Material Actions. Steinhardt's argument lacks substance, however, since Steinhardt could amend the business plan at any time, and the general partner needed Steinhardt's approval to take any Material Action not provided for under the business plan.

At oral argument, counsel for Steinhardt made a corollary argument that since the interim agreement was in place, the general partner could operate the partnership without Steinhardt exercising the authority given to it under the LPA. Accordingly, counsel argued, Steinhardt's amended complaint

---

**18.** The Partners, simultaneously with the execution of the LPA, approved an interim business plan which set forth the policies and parameters of the real estate servicing operation during the period of time between the closing date and the date of the Master Business Plan.

could survive a 12(b)(6) motion. However, as *Goodwin* teaches, the issue does not turn on whether the investor actually exercised its rights, but rather, on what *"legal* rights and powers [were] enjoyed by the investor." 730 F.2d at 107. Moreover, on a 12(b)(6) motion, we must consider the commercial realities of the transaction and, in doing so, we conclude that without Steinhardt's involvement, the Partnership could only operate in a static, inflexible way that is unrealistic and impractical in today's business climate.

■ Steinhardt further argues that the Delaware Revised Uniform Limited Partnership Act supports its position that it was a passive investor. The Act enumerates those actions of the limited partners that do not equate to controlling the management of the partnership and includes many of the approval rights given to Steinhardt. Steinhardt submits that since under the Act it would not be deemed to have exercised control, it must be a passive investor for *Howey* purposes.

We find that the Act is not controlling here. The LPA states "[e]xcept as otherwise expressly provided in this Agreement, the rights and duties of the Partners and the administration and termination of the Partnership shall be governed by the Act." The Act defines control, however, solely for the purpose of limiting the liability of the limited partners to third parties—a situation not present here. 6 Del. C. § 17–303(b). This does not necessarily equate to the threshold for finding a passive investor under federal securities laws. The Delaware Act puts third parties on notice that just because limited partners undertake certain responsibilities with regard to the management of the partnership, that does not make them liable for the obligations of the partnership. Here, Steinhardt is not trying to shield itself from liability, but rather, is seeking relief for alleged violations of federal securities laws. Federal law therefore determines whether the investor's involvement is significant enough to place it outside the role of a passive investor.

Thus, accepting, as we must, the facts as alleged in the amended complaint, we do not find Steinhardt is entitled to relief under *Howey* and its progeny.

## III.

We find that the rights and powers assigned to Steinhardt under the LPA were not nominal, but rather, were significant and, thus, directly affected the profits it received from the Partnership. Accordingly, we hold Steinhardt's investment in the Bristol Oaks Limited Partnership does not constitute an investment contract.

Because we find that Steinhardt was not a passive investor, we need not consider whether the securitization here constituted a common enterprise. We will, therefore, affirm the judgment of the district court.