

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-4-2000

# Securities and Exchange Comm. v. Infinity Group Co.

Precedential or Non-Precedential:

Docket 98-1215, 98-1216, 98-1217

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Securities and Exchange Comm. v. Infinity Group Co." (2000). *2000 Decisions.* Paper 90.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/90

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 4, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 98-1215, 98-1216, 98-1217

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

v.

THE INFINITY GROUP COMPANY; GEOFFREY P.
BENSON; GEOFFREY J. O'CONNOR; FUTURES HOLDING
COMPANY; SLB CHARITABLE TRUST; SUSAN L.
BENSON; JGS TRUST; LINDSEY SPRINGER;
BONDAGE BREAKER MINISTRIES

LINDSEY SPRINGER; BONDAGE BREAKER MINISTRIES,

        THIRD-PARTY PLAINTIFFS

v.

THE UNION STATES OF THE CONSTITUTION, i.e.;
ALASKA; ALABAMA; ARKANSAS; ARIZONA; CALIFORNIA;
COLORADO; CONNECTICUT; DELAWARE; FLORIDA;
GEORGIA; HAWAII; IOWA; ILLINOIS; INDIANA; KANSAS;
KENTUCKY; LOUISIANA; MASSACHUSETTS; MARYLAND;
MAINE; MICHIGAN; MINNESOTA; MISSOURI;
MISSISSIPPI; MONTANA; NORTH CAROLINA; NORTH
DAKOTA; NEBRASKA; NEW HAMPSHIRE; NEW JERSEY;
NEW MEXICO; NEVADA; NEW YORK; OHIO; OKLAHOMA;
OREGON; PENNSYLVANIA; RHODE ISLAND; SOUTH
CAROLINA; SOUTH DAKOTA; TENNESSEE; TEXAS;
UTAH; VIRGINIA; VERMONT; WISCONSIN; WEST
VIRGINIA; WYOMING; WASHINGTON; FEDERAL DISTRICT
OF COLUMBIA,

        THIRD-PARTY DEFENDANTS

        Geoffrey J. O'Connor (98-1215), Geoffrey P. Benson
        (98-1216), Susan L. Benson, Pro Se on behalf of
        herself in her representative capacity on behalf of

SLB Charitable Trust, Futures Holding Company
and JGS Trust (98-1217),

Appellants

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
Civil No.: 97-CV-05458
District Court Judge: Honorable Stewart Dalzell

Argued: March 2, 1999

Before: ALITO and MCKEE, Circuit Judges, and
SCHWARTZ, District Judge*

(Filed: May 4, 2000)

Richard L. Scheff, Esq. (Argued)
Montgomery, McCraken, Walker &
 Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109

 Attorney for Appellants

Harvey J. Goldschmid, Esq.
Richard M. Humes, Esq.
Samuel M. Forstein, Esq.
Timothy N. McGarey, Esq. (Argued)
Securities and Exchange
 Commission
450 Fifth Street, N.W., Stop 2-7
Washington, DC 20549

 Attorney for Appellee
United States Securities and
Exchange Commission

_____

* The Honorable Murray M. Schwartz, Senior District Judge of the United States District Court for the District of Delaware, sitting by designation.

J. Bradford McIlvain, Esq.
Dilworth, Paxson, Kalish &
 Kauffman
1735 Market Street
3200 The Mellon Bank Center
Philadelphia, PA 19103

 Attorney for Appellee
Robert F. Sanville

Mr. Lindsey K. Springer, Pro Se
 (Argued)
5147 South Harvard
Suite 116
Tulsa, OK 74135

OPINION OF THE COURT

McKEE, Circuit Judge.

Defendants appeal the grant of a permanent injunction in this civil action for securities fraud. The defendants argue that the instruments that they offered to investors were not "securities" under federal law, and that the district court therefore lacked subject matter jurisdiction. The defendants also challenge certain evidentiary and procedural rulings that the district court made during the hearing on the motion for a permanent injunction. For the reasons that follow, we will affirm.

I.

In November 1995, defendants Geoffrey Benson and Geoffrey O'Connor formed the Infinity Group Company Trust (the "Trust" or "TIGC").[1] Thereafter, the Trust unveiled an "Asset Enhancement Program" that offered investors an opportunity to invest with the expectation of exceedingly high return and minimal risk. Investors in TIGC were asked

_____

1. Benson was the Executive Trustee Director of TIGC. O'Connor was also a trustee of TIGC. As Trustees of TIGC, Benson and O'Connor exercised sole discretion of the Trust's investment programs.

3

to execute "property transfer contracts" pursuant to which the investors contributed substantial sums of money to the Trust for the Trust to invest. TIGC guaranteed investors that they would receive an annual rate of return ranging from 138% to 181% depending on the amount of the participant's principal investment.2 The guarantees were based upon the Trust's purported performance experience, financial connections, and the ability to pool large amounts of money. Participants were promised that their principal would be repaid upon demand. Once the property transfer contracts were executed, the transferred funds became assets of the Trust and were subject to investment at the sole discretion of the Board of TIGC.

TIGC's solicitation was successful. It raised approximately $26.6 million from over 10,000 investors nationwide. However, TIGC only invested $12 million of the funds it received pursuant to the property transfer contracts, and it never earned a profit on the funds it did invest.3 Rather, the Trust sustained mounting loses that it failed to disclose to investors. The district court described what happened as follows:

> TIGC also used over $2 million in so-called downline commissions to keep the engine of this enterprise humming like a new Mercedes on the autobahn. In the time-dishonored tradition of Charles Ponzi, TIGC substituted new investors' money for real investment return on old investors' funds.

> The rest of TIGC's expenditures were even less investment-related. More than $816,000 was spent on real estate, a significant portion of which went to the purchase and development of a personal residence for

_____

2. For property transfers of $1,200 to $50,000, the guaranteed rate of return was 138%. For amounts greater than $50,000, the return rate was 181%.

3. Defendants contend that the money that was not invested was used for "operating expenses" and charitable contributions or that it constituted "excess profits." Appellant's Br. at 11. The evidence at trial established that the money not invested was used to pay "dividends" to earlier investors and personal expenses of the Benson family. Appellee's Br. at 12-13.

4

Geoffrey and Susan Benson . . . the purchase or lease of cars for their garage, . . . a $6,133.46 spending spree at Circuit City; more than $2,000 spent at television retailers; over $50,000 in `household expenses'; $5,000 to pay off a home mortgage; $10,000 to pay off personal credit card bills; $10,000 for school tuition for the Bensons' son; as well as hundreds for jewelry, bowling equipment and membership fees, [sic] groceries. In short, the Bensons used TIGC as their personal checking account.

In addition, Geoffrey Benson made an undisclosed donation of $1.265 million of investor funds to Lindsey K. Springer, d/b/a Bondage Breaker Ministries.

In addition to all this, defendants Geoffrey Benson and Geoffrey O'Connor paid themselves nearly $300,000 in cash from TIGC's funds, none of it reported to the Internal Revenue Service or even documented on TIGC's books-- which did not exist. Lastly, more than $1.9 million remains unaccounted for, . . . .[4]

SEC v. Infinity Group Co., 993 F.Supp. 324, 325-26 (E.D.Pa. 1998) (original footnote omitted).

On August 27, 1997, the SEC filed the instant complaint in the United States District Court for the Eastern District of Pennsylvania charging "an ongoing scheme, directed by Benson and O'Connor, to defraud public investors through the offer and sale of TIGC securities, in the form of investment contracts," App. 41a, in violation of Section 22 of the Securities Act of 1933, 15 U.S.C. 77v, and Sections 21 and 27 of the Securities Exchange Act of 1934, 15 U.S.C. 78u & 78aa. The Commission sought a permanent injunction, a freeze of the assets of TIGC, appointment of a Trustee to manage the affairs of TIGC, and an order requiring defendants, and certain third parties (the"relief

---

4. The district court agreed with the SEC's claim that the operation of the Trust was "the classic modus operandi of Ponzi schemes." Appellee's Br. at 21. For a brief explanation of the origin of"Ponzi schemes" and Charles Ponzi see Bald Eagle Area School District v. Keystone Financial, Inc., 189 F.3d 321, 324 n.1(3rd Cir. 1999), and Mark A. McDermott, Ponzi Schemes and the Law of Fraudulent and Preferential Transfers, 72 Am. Bankr. L. J. 157, 158 (1998).

5

defendants") to disgorge assets of TIGC that had been improperly transferred.5

On September 5, 1997, after a hearing, the district court issued an Order for Preliminary Injunction, Appointment of Trustee, and Freeze of Assets and Other Relief. Although the Trust's funds and assets were frozen, the September 5 Order provided for the release of funds to pay legal expenses and fees, as well as defendants' living expenses. On February 6, 1998, the district court entered afinal judgment against the defendants enjoining them from further violations of the securities laws and ordering disgorgement of all amounts contributed to the Trust by the Trust participants. This appeal followed.

II.

Defendants raise four issues on appeal. First, they argue that the property transfer contracts that were used as an "investment" vehicle here were not "securities" under federal securities laws, and therefore that the district court lacked subject matter jurisdiction. Second, they argue that inasmuch as they sincerely believed in the investments that TIGC made, there can be no liability for securities fraud. Third, they allege that the district court erred in denying their concededly untimely demand for a jury trial. Lastly, they contend that several allegedly erroneous procedural and evidentiary rulings constitute reversible cumulative error even though the rulings were harmless when considered separately. We will discuss each argument in turn.

III.

We must first address the defendants' claim that the
_____

5. The SEC sought disgorgement from the following relief defendants: Futures Holding Company (controlled, in part, by Benson); SLB Charitable Trust (a charitable trust established in the name of Susan Benson, Benson's wife); Susan L. Benson (trustee of SLB and TIGC); JGS Trust (a "family trust" controlled by Benson); Lindsey Springer (manager and "legal representative" of TIGC and controller of Bondage Breaker Ministries); and Bondage Breaker Ministries.

6

district court lacked subject matter jurisdiction because the "property transfer contracts" were not "securities" under federal securities laws. Inasmuch as this is an appeal from a final judgment, we have jurisdiction to review the district court's decision under 28 U.S.C. S 1291. We exercise plenary review over a district's ruling on a motion to dismiss for lack of subject matter jurisdiction. Delaware Valley Citizens Council v. Davis, 932 F.2d 256, 264 (3d Cir. 1991).6

It is well established that federal securities laws only apply to the purchase or sale of "securities" as defined therein. Steinhardt Group Inc. v. Citicorp, 126 F.3d 144, 150 (3d Cir. 1997).

> `[S]ecurity' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, . . . investment contract, voting-trust certificate, . . . any interest or instrument commonly known as a `security', or any certificate of interest or participation in, . . . or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. S 77b(a)(1) (emphasis added). The property transfer agreements that TIGC's investors executed certainly appear to be "investment contract[s]," however "[t]he term investment contract has not been defined by Congress, nor does the legislative history to the 1933 and 1934 Acts illuminate what Congress intended by the term investment contract." Steinhardt, 126 F.3d at 150-51. In SEC v. W.J. Howey Co., 328 U.S. 293 (1946), the Supreme Court provided a framework for determining when such agreements are subject to federal law. The Court stated:

> [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby

_____

6. Although the district court treated defendants' motion to dismiss for lack of subject matter jurisdiction as a Rule 12(h)(3) motion, the parties here have treated it as a 12(b)(1) motion. We exercise plenary review under either. See Nationwide Insurance Co. v. Patterson, 953 F.2d 44, 45 (3d Cir. 1991) (Rule 12(h)(3) motion to dismiss is subject to plenary review).

7

> a person invests his money in a common enterprise
> and is led to expect profits solely from the efforts of the
> promoter or a third party, it being immaterial whether
> the shares in the enterprise are evidenced by formal
> certificates or by nominal interests in the physical
> assets employed in the enterprise.

Howey, 328 U.S. at 298–99. Thus, the property transfer contracts between TIGC and its investors are securities if they were (1) "an investment of money," (2)"in a common enterprise," (3) "with profits to come solely from the efforts of others." Id. at 301, Steinhardt , 126 F.3d at 151.

Defendants agree that the property transfer contracts satisfy the first and third prongs of the Howey test. Indeed, they can hardly deny it. There clearly was an investment of money because the contracts required and evidenced the monetary transfer solely for the purposes of receiving the "guaranteed" return of between 138% and 181%. See Steinhardt, 126 F.3d at 151 (finding prong one met where an investment was made with the expectation of an 18% return on investment). Similarly, the third prong is clearly satisfied here because the expected return was to be "with profits to come solely from the efforts of others." Id. (quoting Howey, 328 U.S. at 301).

Our focus under the third prong is whether "the purchaser [is] attracted to the investment by the prospect of a profit on the investment rather than a desire to use or consume the item purchased." Id. at 152. TIGC's investors did not intend to consume anything in return for the money they gave to TIGC. Whether the investor has "meaningfully participated in the management of the partnership in which it has invested such that it has more than minimal control over the investment's performance" is also relevant under the third prong. Id. TIGC concedes that"the TIGC Board retained exclusive control over the investment decision." Appellant's Br. at 18. Thus, the participants were passive investors who exercised no control over the funds they gave to TIGC. Those investors depended upon the managerial decisions of others. Therefore, we agree that thefirst and the third prongs have been satisfied,7  and we will focus our

_____

7. Even though the parties agree that the first and third prong are satisfied, we must independently satisfy ourselves that those prongs are

analysis upon the "common enterprise," or second prong, of the Howey test.

We have held that the common enterprise requirement is satisfied by "horizontal commonality."[8] Horizontal commonality is characterized by "a pooling of investors' contributions and distribution of profits and losses on a pro-rata basis among investors." Steinhardt , 126 F.3d at 151 (quoting Maura K. Monaghan, An Uncommon State of Confusion: The Common Enterprise Element of Investment Contract Analysis, 63 Fordham L.Rev. 2135, 2152–53 (1995) (footnotes omitted)). See also Salver v. Merrill Lynch, Pierce, Fenner & Smith, 682 F.2d 459, 460 (3d Cir. 1982) (holding that a commodity account is not a "security" because it is not part of a pooled group of funds). Here, it is undisputed that TIGC's solicitation and membership materials stated that TIGC would pool participant

_____

established because the inquiry is jurisdictional, and we have an independent responsibility to insure that subject matter jurisdiction exists. See Steel Company v. Citizens for a Better Environment, 523 U.S. 83, 94 (1998) (federal courts must decide jurisdictional issues "even when not otherwise suggested, and without respect to the relation of the parties to it.").

8. Circuit courts of appeals utilize two distinct approaches in analyzing commonality; "vertical commonality," and "horizontal commonality." "Vertical commonality" focuses on the community of interest between the individual investor and the manager of the enterprise. See e.g., Long v. Acultz Cattle Co., 881 F.2d 129 (5th Cir. 1989) ("A common enterprise is one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties" (quoting Glenn W. Turner Enterprises, Inc., 474 F.2d 476, 482 n.7 (9th Cir. 1973)). "Horizontal commonality" examines the relationship among investors in a given transaction, requiring a pooling of investors' contributions and distribution of profits and losses on a pro-rata basis. See e.g., Salcer v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 682 F.2d 459 (3d Cir. 1982); Cooper v. King, 114 F.3d 1186 (6th Cir. 1997); SEC v. Lauer, 52 F.3d 667 (7th Cir. 1995).

In Steinhardt, we declined to decide if we should adopt a vertical commonality analysis when conducting an inquiry under the commonality prong of Howey. Steinhardt , 126 F.3d at 151. Inasmuch as we conclude that horizontal commonality exists here, we need not now decide if we should also adopt a vertical commonality analysis.

9

contributions to create highly-leveraged investment power that would yield high rates of return while protecting the investors' principal contributions. For example, the Trust's Private Member Material and Manual represents:

> The Infinity Group Company invests for profit by accepting amounts as low as [$1200] from thousands of people like you, and creating large blocks of funds that are in the millions of dollars. This gives the Trust a leverage position whereby we can command large profits, and have the security of never putting the principal at risk. This is very sophisticated investing that cannot be accomplished unless you have millions of dollars to deposit in a top world US bank.

App. 261a. However, TIGC argues that commonality is nevertheless lacking because the investors did not"share proportionately in the profits or losses of TIGC or the various investment programs," Appellant's Br. at 19 (emphasis omitted). Rather, TIGC asserts that "each participant would execute an individual contract with TIGC providing for a fixed return, payable on demand (principal only) or on a specific date. . . ." Id. According to TIGC:

> [T]he property transfers were obligations of TIGC to repay the other party to the contract at a specific time, and did not represent a direct interest in TIGC, any other entity or a specific security or investment vehicle. . . . The property transfers were not earmarked for any particular purpose, or even any particular type of investment. . . . Under these contracts, the TIGC Board retained exclusive control over the investment decision and participants were not promised that their funds would be invested in any particular investment program.

Id. at 18 (internal citations omitted).

However, TIGC's denial of horizontal commonality is contrary to the record. By the plan's very terms, the return on investment was to be apportioned according to the amounts committed by the investor. Each investor's apportionment of profits was represented by certain "capital units" obtained in exchange for executing a "property transfer agreement." The number of units an investor

10

purchased was, of course, dependent upon the size of his or her investment and the investor's return was directly proportional to the amount of that investment. TIGC's solicitation materials stated:

> [W]ith the Private Trust, what you will be doing is making a Property Transfer into the Trust in exchange for 1 Capital Unit for every $100 deposit. In turn the Trust guarantees that you will make a certain annual dividend. These dividends are a minimum of 20% up to 181% depending on the amount of Capital Units you hold.

Supp. App. 77. The materials also stated that "[d]ividends are dispersed . . . as the assets of the Trust increase and as the Board of Trustees elects to pay guaranteed dividends," App. 261a.

TIGC seeks to negate the obvious import of its structure by arguing that there are technical characteristics that distinguish the instruments involved here from those that are "securities." We are not persuaded. The defendants' claim that the property transfer contracts do not constitute "investment contracts" because the investors were to receive a fixed rate of return rather than a rate dependent on the success of the investments. The defendants argue:

> [I]f the aggregate value of the investments increased, each contract holder would not share in the appreciation. Rather, they would receive only their fixed, contractually agreed-upon return. . . . Similarly, if the value of TIGC investments decreased, the contract holder would still be entitled to the agreed-upon, fixed return on his or her property transfer contract. . . . In the event that the value of the investments dropped below the ability of TIGC to honor its commitment to a specific individual, the participants would not share proportionately (`pro rata') in the shortfall.

Appellant's Br. at 19 (internal citations omitted). However, the definition of security does not turn on whether the investor receives a variable or fixed rate of return. See El Khaden v. Equity Securities Corp., 494 F.2d 1224, 1229 (9th Cir. 1974) (that expected profits remain constant while

11

risk of loss varies does not remove a plan from the definition of a security); National Bank of Yugoslavia v. Drexel Burnham Lambert, Inc., 768 F.Supp 1010, 1016 (S.D.N.Y. 1991) (holding that time deposits made for investment purposes in return for a fixed rate of interest were investment instruments rather than consumer or commercial bank loans).

Profits can be either "capital appreciation resulting from the development of the initial investment" or earnings contingent on profits gained from the use of investors' funds. United Housing Foundation, Inc. v. Forman , 421 U.S. 837, 852 (1975). The mere fact that the expected rate of return is not speculative does not, by itself, establish that the property transfer contracts here are not "investment contracts" within the meaning of federal securities laws. See Howey, 328 U.S. at 301 (explicitly rejecting the theory that a non-speculative enterprise cannot be considered an investment contract; "it is immaterial whether the enterprise is speculative or non-speculative").

Moreover, the transactions here are easily distinguished from those in Marine Bank v. Weaver, 455 U.S. 551 (1982), where the Supreme Court held that FDIC-protected certificates of deposit offering a fixed rate of return were not securities. There, the Supreme Court stated that Congress "did not intend to provide a broad federal remedy for all fraud." Id. at 557. The Court reasoned that certificates of deposit issued by federally-regulated banking institutions differed from other long-term debt obligations in part because "[i]t is unnecessary to subject issuers of bank certificates of deposit to liability under the antifraud provisions of the federal securities laws since the holders of bank certificates of deposit are abundantly protected under federal banking laws," Id. at 559. The Court noted that a "purchaser of a certificate of deposit is virtually guaranteed payment in full," Id. at 551. Here, TIGC's investors were offered no such protection.9"The crux of the Marine Bank decision is that federal banking regulations and federal

_____

9. TIGC's investors are therefore like "the holder[s] of an ordinary long-term debt obligation (who) assume[ ] the risk of the borrower's insolvency." Id. at 551-52.

deposit insurance eliminate the risk of loss to the investor, therefore obviating the need for protection of the federal securities laws," Gary Plastic Packing Corp. v. Merrill Lynch, 756 F.2d 230, 240 (2d Cir. 1985).10 As will become more evident in our discussion of TIGC's "investment" in certain railroad bonds, the investors here were guaranteed nothing despite TIGC's purported guarantee of principal."The fundamental purpose undergirding the Securities Acts is `to eliminate serious abuses in a largely unregulated securities market,' " Reves v. Ernst & Young, 494 U.S. 56, 60 (1990) (quoting United Housing, 421 U.S. at 849 (distinguishing Marine Bank where no risk-reducing factor was present)).

> The aim is to prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation; to place adequate and true information before the investor; to protect honest enterprise, seeking capital by honest presentation, against the competition afforded by dishonest securities offered to the public through crooked promotion. . . .

S.Rep. No. 47, 73d Cong., 1st Sess., at 1 (1933).

We take a flexible and realistic approach in determining when a particular scheme requires the protection of federal securities laws.

For example, in Howey, the defendant owned large tracts of citrus acreage that it sold to the public. Purchasers of the tracts received land sales and service contracts and, upon full payment of the purchase price, the land was conveyed by warranty deed. However, under the arrangement between Howey and the purchasers, a servicing corporation was given "full and complete" possession of the acreage, and full discretion to grow,

_____

10. Defendants contend that "just because the property transfers at issue in this case do not constitute securities does not mean they were exempt from any form of regulation whatsoever. Perhaps there are other branches of government, state or federal, with jurisdiction over TIGC, or other regulations or statutes which TIGC's conduct violated." Appellant's Br. at 20. However, they do not identify any applicable regulation or statute. This is consistent with our conclusion that this enterprise required the protections of federal securities laws.

harvest, and market crops grown on the tracts with very little accountability to the purchaser. The SEC instituted an action against Howey because the corporation had not complied with the registration requirements of federal securities laws. Howey defended by arguing that registration was not required because it was not selling "securities" under federal law. The "lower courts . . . treated the contracts and deeds as separate transactions involving no more than an ordinary real estate sale and an agreement by the seller to manage the property for the buyer," Howey, 328 U.S. at 297-98, and concluded that they did not constitute "securities" under federal law. However, the Supreme Court disagreed because Howey was not merely offering fee simple interests in land coupled with a contract for management services. Rather, the Court concluded that Howey was offering "an opportunity to contribute money and to share in the profits" of the enterprise. Id. at 299. "[The purchasers were] attracted solely by the prospects of a return on their investment," and the land sales contracts and warranty deeds were merely a "convenient method" by which to apportion profits. Id. at 300. Thus, the Court concluded that the agreements were securities. The Court reasoned:

> The investors provide the capital and share in the earnings and profits; the promoters manage, control and operate the enterprise. It follows that the arrangements whereby the investors' interests are made manifest involve investment contracts, regardless of the legal terminology in which such contracts are clothed.

Id. (emphasis added). See also SEC v. C.M. Joiner Leasing Corp., 320 U.S. 344 (1943) (finding that a defendant selling assignment of oil leases was "not as a practical matter offering naked leasehold rights," instead "the (oil) exploration enterprise was woven into these leaseholds, in both an economic and a legal sense; the undertaking to drill a well runs through the whole transaction as the thread on which everybody's beads were strung.")

Here, the investors' beads were strung upon the gossamer guarantee of seemingly impossibly high returns at no risk. The fact that TIGC promised a "fixed rate of

14

return" based upon the amount invested is irrelevant. We will not embroider a loophole into the fabric of the securities laws by limiting the definition of "securities" in a manner that unduly circumscribes the protection Congress intended to extend to investors. Rather, we must scrutinize these "property transfer contracts" in a manner that "permits the fulfillment of the statutory purpose of compelling full and fair disclosure relative to the issuance of the many types of instruments that in our commercial world fall within the ordinary concept of a security." Howey, 328 U.S. at 299 (internal quotation marks and citation omitted). Our inquiry:

> embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.

Id.

We must consider that Congress "enacted a definition of `security' sufficiently broad to encompass virtually any instrument that might be sold as an investment," Reves, 494 U.S. at 61. The securities laws were intended to provide investors with accurate information and to protect the investing public from the sale of worthless securities through misrepresentations. H.R.Rep. No. 85, 73d Cong., 1st Sess., at 1-5 (1933). As noted above, TIGC accepted nearly $26.6 million from approximately 10,000 investors. TIGC persuaded those investors to part with their cash by guaranteeing the proverbial "blue sky;" fantastic profit at no risk. Of the $26.6 million raised, more than half of the money was used to satisfy the material "needs" of the individual defendants. The balance was poured down empty wells that could hardly be confused with prudent investments. TIGC realized no return whatsoever on those "investments." Given the totality of the circumstances here, the property transfer contracts clearly constitute securities, and the district court therefore had subject matter jurisdiction.

15

IV.

Defendants argue that the SEC failed to establish the scienter required for liability under Section 17(a) of the Securities Act,11 Section 10(b) of the Exchange Act12 or Rule 10b-5.13 They argue that they cannot therefore be liable even if the property transfer contracts were securities.

The SEC must establish the requisite scienter to establish securities fraud. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976); Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 135 F.3d 266, 272-73 (1998); McLean v. Alexander, 599 F.2d 1190, 1196-97 (3d Cir. 1979). Scienter is "a mental state embracing intent to deceive, manipulate or defraud," Hochfelder, 425 U.S. at 193 n.12; McLean, 599 F.2d at 1197. We have previously held that the scienter required for securities fraud includes recklessness, and we have adopted the definition of recklessness set forth in Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033 (7th Cir. 1977). See also Sharp v. Coopers & Lybrand, 649 F.2d 175, 1993 (3d Cir. 1981).14 Accordingly, recklessness includes:

> [H]ighly unreasonable (conduct), involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, . . .

_____

11. Section 17(a) makes it unlawful for any person in the offer or sale of any security to: (1) "employ any device, scheme or artifice to defraud;" (2)
"obtain money or property by means of any untrue statement [or omission] of material fact;" or (3) to "engage in any transaction, practice
or course of business which operates . . . as a fraud or deceit upon the purchaser." 15 U.S.C. S 77q(a).

12. Section 10(b) of the Exchange Act prohibits "manipulative" or "deceptive" conduct "in connection with the purchase or sale of a security." 15 U.S.C. S 78j(b).

13. Rule10b-5 proscribes (1) the employment of any "device, scheme or artifice to defraud;" (2) the making of "any untrue statement [or omission] of material fact;" and (3) the engagement "in any act, practice, or course of business which operates . . . as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. S 240.10b-5.

14. The recklessness standard applies to both omissions and misstatements. McLean, 599 F.2d at 1197.

16

which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

McLean, 599 F.2d at 1197 (citing Sundstrand Corp., 553 F.2d at 1045).

The SEC argues that scienter is evidenced by TIGC's guarantees of high rates of return that were unsupported by any honest due diligence. The defendants, on the other hand, contend that their actions "were entirely consistent with the fact that they believed their representations (in the Trust literature and elsewhere) [to be] true." Appellant's Br. at 23. However, good faith, without more, does not necessarily preclude a finding of recklessness. Therefore, even if the defendants believed TIGC's investments were sound, they may still be liable for securities fraud if their belief was based upon nothing more than a reckless disregard of the truth. Moreover, we reiterate that TIGC invested less than half of the money obtained under the property transfer contracts. In addition, a minimum of $3,649,000 of the funds was spent on such things as the Bensons' home, a new Mercedes Benz, etc. Nevertheless, the defendants claim that they "attempted to obtain documentation and contractual guarantees from the investment providers" and "were [themselves] the victims of fraud on the part of the investment providers." Id. at 29–30. We are not persuaded.

The defendants concede that no profits were ever realized from the funds that were actually invested. Appellant's Br. at 11. One need look no further than one example of an investment that TIGC made to understand why no profit was ever realized and to appreciate the specious nature of the denials of recklessness. In October 1996, TIGC purchased a bond of the Marietta and Northern Georgia Railway that had been issued in 1889. TIGC paid $302,000 for that bond, apparently based upon "unsubstantiated boasts of value ranging from $35 million to $107 million, and without performing any meaningful type of due diligence inquiry to clarify the $72 million discrepancy." Appellee's Br. at 28. TIGC paid $302,000 even though the bond had a face value of only $1000. Despite the unique investment acuity proclaimed in the Trusts' materials, the

17

defendants missed a little glitch in this investment bonanza. The railroad that issued the bond had gone bankrupt in 1895, and it had ceased to exist in 1896. Supp. App. 1-4. The bond was therefore "worthless except for its modest value as a collectible (which [was] estimated at $80-100.)." Appellee's Br. at 29. Thus, TIGC used a portion of those funds that it did not divert to personal use to pay $302,000 for a bond with a face value of $1,000 that had been issued by a railroad that had gone out of business 100 years ago.[15] In referring to this investment the district court stated:

> [W]e suspect that even a complete neophyte infinance, accounting, or economics would suspect, when confronted with such an investment, that defendants' business was on the wrong track. Instead, TIGC chose in its materials to value the ancient bond at $107 million!

993 F.Supp. at 330. It is a small wonder that the district court referred to TIGC as a "financial train wreck." Id. at 326. Yet, TIGC's offering materials proclaimed that the unique skill it provided would enable the Trust to guarantee very high rates of return with no risk to principal. The solicitation materials boasted that participants would have "an opportunity that has a 100% success rate, for 100% of the people who become associated with my business." Supp. App. 74. Investors were told that their investments were "guaranteed by a top 100 World Bank" and "the returns (Profits) that (TIGC based) the [return rate of] 138% and 181% on (were) guaranteed by the Trust, making this one of the safest programs available." App. 271a (emphasis omitted).

Even if we indulge the defendants and assume arguendo that they believed in these guarantees, we nevertheless must examine the foundation such a belief would have rested upon. A good faith belief is not a "get out of jail free card." It will not insulate the defendants from liability if it is the result of reckless conduct. See McLean .[16] However,

---

15. This investment was therefore the ultimate"turn around play."
16. We will assume that a defendant can genuinely have a subjective belief that demonstrates good faith even though it is the result of reckless conduct. However, it clearly can be argued that a subjective belief based only upon an inquiry that is reckless can never properly be considered a "good faith" belief.

18

under our standard of review, we must view the evidence in the light most favorable to the SEC as verdict winner. Eisenberg v. Gagnon, 766 F.2d 770, 778 (3d Cir. 1985). In doing so, we readily conclude that the district court did not err in finding that the SEC had established the necessary scienter for securities fraud. The district court stated:

> [W]e reject Geoffrey Benson's proffered defense that he was ignorant of the falsity of TIGC's statements, and in all events he acted in good faith in soliciting investor funds and pursuing investments on behalf of TIGC. Even assuming that those statements are true--and we do not, given the mountain of evidence of invidious motive here--ignorance provides no defense to recklessness where a reasonable investigation would have revealed the truth to the defendant. . . . Similarly, good faith is no shield to liability under the antifraud provisions of the Securities Acts. . . .
>
> But we need not rely on either the ignorance defense, or the existence of recklessness, in Geoffrey Benson's case. His actual intent to defraud may be inferred from his wholly successful, and carefully-crafted, offering materials. . . . [T]he materials at length depict a mysterious cabal into which only the initiated, like TIGC's trustees, could enter. Benson's texts weave visions of risk-free, high-return investing in a clever tapestry of anti-government, individualist fervor. Although the offering materials often speak of mysteries and the need to maintain secrecy, in fact Geoffrey Benson and his colleagues well knew that the reason these secrets were not mentioned is because there were none. As Geoffrey Benson and O'Connor allowed their offering materials to be disseminated around the country--by fax on demand, through a legion of downline representatives, and via the mails-- they had to know that they were funding payments to early investors with new investors' money rather than with investment return. In short, Geoffrey Benson and Geoffrey O'Connor knew precisely what they were doing in these materials, and that was engaging in a hugely successful interstate fraud.

19

At best, defendants' investment enterprise began as a reckless financial enterprise, and evolved into an intentional scheme to defraud investors of their money when that money became necessary to prevent TIGC's collapse. At worst, TIGC's Asset Enhancement Program was from its inception a Ponzi scheme, calculated to bilk investors of funds by preying on their excessive greed, their feelings of exclusion from America's current prosperity, and their fears of jackbooted government intrusion.

993 F. Supp. at 330-31.[17] The district court's analysis is consistent with the record. Indeed, the record mandates the court's conclusion.

In McLean, we stressed that plaintiff:

[c]ircumstantial evidence may often be the principal, if not the only, means of proving bad faith. A showing of shoddy accounting practices amounted at best to a `pretended audit,' or of grounds supporting a representation `so flimsy as to lead to the conclusion that there was no genuine belief back of it' have traditionally supported a finding of liability in the face of repeated assertions of good faith. . . . In such cases, the factfinder may justifiably conclude that despite those assertions the `danger of misleading . . . (was) so obvious that the actor must have been aware of it.

_____

17. TIGC's materials also offered not so subtle hints that TIGC could assist in "sheltering" assets where others with less expertise had failed. TIGC's materials proclaimed:

If you are thinking about establishing an off-shore Trust or Bank Account please beware! Belize, the Cayman's and may [sic] others that used to be off-shore havens are about as safe as throwing your money in the fireplace. The U.S. government has twisted most of these off-shore government's arms to the point where they will give out information and let the U.S. do whatever they want to.

We have access to off-shore facilities that are totally safe when set up properly. If you are serious, and do not mind spending some time and money, you will want to contact us to get some of the preliminary details.

Supp. App. 88-89.

20

Mclean, 599 F.2d at 1198 (citing Sundstrand, 553 F.2d at 1045)(footnotes omitted)). Although defendants assert a good faith belief that their representations were true, "an opinion that has been issued without a genuine belief or reasonable basis is an `untrue' statement which, if made knowingly or recklessly, is culpable conduct actionable under [the securities laws]." Eisenberg , 766 F.2d at 776 (emphasis added).

> When the opinion or forecast is based on underlying
> materials which on their face or under the
> circumstances suggest that they cannot be relied on
> without further inquiry, then the failure to investigate
> further may `support [ ]an inference that when [the
> defendant] expressed the opinion it had no genuine
> belief that it had the information on which it could
> predicate that opinion.'

Id. (citing McLean, 599 F.2d at 1198). Here, the evidence supporting TIGC's purported belief in its representations is "so flimsy as to lead to the conclusion that there was no genuine belief " in the validity of TIGC's guarantee or the soundness of its investments. McLean, 599 F.2d at 1198 (citing Ultramares Corp. v. Touche, 174 N.E. 441 (N.Y. 1931)). The guarantees were "so recklessly made that the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception," Id. at 1197 (citing Coleco Industries, Inc. v. Bernamn, 567 F.2d 569, 574 (3d Cir. 1977)). Indeed, here, the recklessness can be equated to conscious deception, especially when we consider how the defendants' primary focus was upon improving their own (apparently lavish) lifestyle rather than attempting to get a decent (let alone extraordinary) rate of return on the investments of the participants in the Trust.

The Trust failed: (1) to obtain certified financial statements from the programs in which it invested, (2) to inquire into whether programs were insured or guaranteed by a banking institution, (3) to obtain legal opinions about the legitimacy of the investment programs and (4) to obtain certificates of good standing.18

_____

18. We also note that TIGC's "warning of risk" was less than forthcoming. For example, the solicitation materials stated:

21

We are equally unpersuaded by the defendants' attempts to shift the responsibility to the purported "dishonest and fraudulent activities" of the investment providers. Appellant's Br. at 28. Although several of the investment companies that TIGC did business with are now either defunct or under investigation, the evidence is inconsistent with TIGC as a mere "victim." Rather, it appears that several scoundrels were sleeping in the same bed, and these defendants were amongst them. We doubt that it was a mere oversight that TIGC continued to guarantee high rates of return even after defaults in $7.5 million worth of their investments. Thus, even if the initial guarantees were not recklessly made, the record would still support a finding that TIGC was reckless in failing to modify its guarantees after such massive defaults. Accordingly, we hold that the SEC presented abundant evidence of the scienter requirement of securities fraud. See McLean, 599 F.2d at 1197.

V.

Defendants next contend that the district court erred in denying their concededly untimely demand for a jury trial. The SEC filed its Complaint on August 27, 1997. The defendants filed an Answer on September 26, 1997; and relief defendants filed an Answer on October 28, 1997. The defendants did not file their Demand for Jury Trial until January 13, 1998; two and one half months after thefinal pleading in this case.

Fed. R. Civ. P. 38 states, in pertinent part, "Any party may demand a trial by jury of any issue triable of right by a jury by . . . serving upon the other parties a demand

_____

      Yes we do guarantee the returns you will make on your exempt
      security transfer. . . . (P)lease do not interpret guarantee as meaning
      absolutely no risk. There is no such thing. There's a risk in getting
      out of bed in the morning. Or . . . a big rock could fall on Ohio and
      wipe out TIGC and everything else in the state. Remember, things
      can happen that are beyond anyone's control.

App. 230a.

22

thereof in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue . . . ," Fed.R.Civ.P. 38(b). Fed R. Civ. P. 39(b) provides, "[N]otwithstanding the failure of a party to demand a jury in an action in which such a demand might have been made of right, the court in its discretion upon motion may order a trial by jury of any or all issues." Fed.R.Civ.P. 39(b). Therefore, a district court may still grant a jury trial, even where the demand was untimely made.

We review the district court's denial of the request for a jury trial for abuse of discretion. William Goldman Theatres, Inc. v. Kirkpatrick, 154 F.2d 66, 68 (3d Cir. 1946). "An abuse of discretion is a `clear error of judgment,' and not simply a different result which can arguably be obtained when applying the law to the facts of the case." In re Tutu Wells Contamination Litigation, 120 F.3d 368, 387 (3d Cir. 1997) (quoting United Telegraph Workers, AFL-CIO v. Western Union Corp., 771 F.2d 699, 703 (3d Cir. 1985)). Although we understand that the delay here may have been partly attributable to a change in counsel, it is nevertheless uncontested that the only justification for the delay was attorney inadvertence. Courts in this Circuit generally deny relief when "the only basis for such relief advanced by the requesting party is the inadvertence or oversight of counsel." See Plummer v. General Elec. Co. , 93 F.R.D. 311, 313 (E.D. Pa. 1981); and cases cited therein. However, this is not a mechanical rule.

Courts consider several factors in determining whether to grant an untimely jury demand. They are:

> 1) whether the issues are suitable for a jury; 2) whether granting the motion would disrupt the schedule of the Court or the adverse party; 3) whether any prejudice would result to the adverse party; 4) how long the party delayed in bringing the motion; and 5) the reasons for the failure to file a timely demand.

Fort Washington Resources, Inc. v. Tannen, 852 F. Supp. 341, 342 (E.D. Pa. 1994). Here, in denying the untimely request, the district court noted that (i) "Defendants offer nothing to excuse their untimeliness except the fact that

23

they switched counsel in mid-November" -- a full two months prior to making the demand, and (ii) "the fact that the demand was made only two weeks before trial-- and not fully briefed until one week before trial -- means that the Commission's case would be greatly prejudiced by our granting the motion." App. 118a. The district court did not abuse its discretion in denying the belated request for a jury trial under these circumstances.

We agree that the defendants did not make an adequate showing that the issues involved in this case were particularly suitable for a jury. Contrary to the defendants' assertion, we have rejected an argument for entitlement to a jury trial based upon the quantum of damages. William Goldman Theatres, 154 F.2d at 69 ("evidentiary facts are intricate and will require auditing, if not an accounting[,] [w]e can perceive substantial difficulties, though not insuperable obstacles, to the framing of a charge which properly would submit the issue of damages to a jury").

The defendants also argue that the scheduling of the initial preliminary injunction hearing created time pressures resulting in counsel's failure to timelyfile a jury demand. Specifically, they argue that after new counsel entered their appearance in mid-November, "they faced the time consuming task of absorbing and assessing the facts, the procedural posture of the case, and potential trial strategies," as well as conducting discovery. Appellant's Br. at 32-33. The district court concluded that defendants' explanations "(fell) short" of excusing their untimely demand. App. 118a-19a. We agree.

We disagree, however, with the district court's conclusion that granting the belated jury request would have materially prejudiced the SEC under the circumstances here. Nevertheless, based upon all of the factors we have enumerated, we hold that the district court did not abuse its discretion in denying defendants' untimely demand for a jury trial.

VI.

The defendants contend that the cumulative effect of four alleged evidentiary and procedural errors impaired their

24

right to present and prepare an adequate defense. This aggregation of errors is known as the "cumulative error doctrine." Under that doctrine appellate courts may determine that, although certain errors do not require relief when considered individually, the cumulative impact of such errors may warrant a new trial. In other words, under this theory, the whole is greater than the sum of its parts. However, unlike some of our sister courts of appeals,[19] we have rejected the cumulative error doctrine, at least in the context of a civil trial. See Lockhart v. Westinghouse Credit Corporation, 879 F.2d 43, 57 (3d Cir. 1989), overruled on other grounds by Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089 (3d Cir. 1995). Moreover, even if we were to apply the doctrine of cumulative error, we would conclude that defendants are entitled to no relief because the individual rulings that they challenge under that doctrine were not erroneous.

A.

Defendants claim that the district court erred in "cutting . . . fees for defense counsel" two days before the final injunction hearing and thereby "unfairly (hampering) the defense efforts to complete discovery and to mount an effective defense at trial." Appellant's Br. at 35. In November 1997, the district court issued a preliminary injunction authorizing a court-appointed trustee to disburse $125,000 for legal fees and expenses on behalf of the defendants from the previously frozen assets. As a result of receiving information that the defendants were independently attempting to raise $175,000 to defray legal expenses, the SEC successfully moved to modify the district court's original provision of legal fees and expenses. Two days before the final injunction hearing began, the district court granted the SEC's motion in part, and issued an

_____

19. See e.g., United States v. Rivera , 900 F.2d 1462, 1469 (10th Cir. 1990) ("The cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error"); Malek v. Federal Ins. Co. , 994 F.2d 49, 55 (2d Cir. 1993); Frymire-Brinati v. KPMG Peat Marwick, 2 F.3d 183, 188 (7th Cir. 1993); Hendler v. United States, 952 F.2d 1364, 1383 (Fed. Cir. 1991).

order prohibiting defense counsel from disposing of further trust assets to raise funds for fees or expenses.

The authority to freeze assets in receivership, in whole or in part, is committed to the district court's sound discretion. Commodity Futures Trading Commission v.

American Metals Exchange Corp., 991 F.2d 71, 79 (1993). A freeze of assets is designed to preserve the status quo by preventing the dissipation and diversion of assets. Id. (quoting SEC v. Capital Counselors, Inc., 512 F.2d 654 (2d Cir. 1975)). Here, the district court's order modifying the initial release of legal expenses and fees was prudent inasmuch as the defendants were attempting to raise funds to pay for legal services.20 In American Metals, we found no abuse of discretion where the district court denied a request to pay attorney's fees from frozen assets where it was shown that the defendant had access to other funds not in receivership. Accordingly, we do not find abuse of discretion here.

B.

Defendants argue that the district court erred in "arbitrarily advancing the date for the (final injunction

_____

20. The record indicates that Infinity investors received the following correspondence from the "Freedom For America Ministry and Friends of Infinity":

> The SEC, government, the Judge, or Trustee (It's hard to tell any of
> them apart) has approved an `allowance' out of YOUR `MONEY' to be
> paid to us to live on. . . . Each and everyone of you can help with
> your gift to FAM, along with the completed form provided. Your gift
> at this time is important because the government has frozen [NOT
> SEIZED] all assets of TIGC and related entities which makes it
> impossible at this time for them to fund a Member Law Suit against
> the government, or to adequately finance their own offense. Your gift
> will be used for the following: Administrative and operating . . .
> expenses . . . 15%, Private Member Law Suit . . . 25%, legal offense
> fund for TIGC . . . 25%, and investments . . . 35%. If the average gift
> is $100.00, FAM would have about $175,000 to fund a TIGC
> Member Suit, $175,000 to help TIGC with their legal costs, and
> $245,000 for investment purposes over a period of time.

Supp. App. 145-46.

hearing) by two days" because defense was operating under an expedited discovery schedule and "could not afford to lose the two full days in which to prepare" for the final injunction hearing. Appellant's Br. at 35. This claim is wholly without merit.

Matters of docket control and scheduling are within the sound discretion of the district court. State of Alaska v. Boise Cascade Corp., 685 F.2d 810, 817 (3d Cir. 1982). Here, the district court notified both parties, over three weeks before the originally scheduled date, that the hearing date would have to be changed due to changes in the district court's criminal docket. We find neither"actual" nor "substantial" prejudice in the rescheduling. The change was only two days, and it impacted both sides.

C.

Defendants allege error in the court's refusal to admit lay opinion testimony from John F. Jackman, an insurance specialist whom defendants called to testimony about "legitimate bank instruments and other investment programs which produce extremely high returns with minimal risk." Appellant's Br. at 36. The defendants contend that Mr. Jackman's testimony "was probative of the issue of whether [TIGC was] reckless or acted with an intent to defraud" and would contradict the finding that the promised rates of return were unlikely. Id. at 37. We review the exclusion of lay opinion testimony for abuse of discretion. Government of the Virgin Islands v. Knight, 989 F.2d 619, 629 (3d Cir. 1993). Rule 701 of the Federal Rules of Evidence provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinion or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding if the witness' testimony or the determination of a fact in issue.

Fed. R. Evid. 701. A lay opinion is rationally based on the witness' perception and "firsthand knowledge of the factual predicates that form the basis for the opinion." Knight, 989 F.2d at 629 (citing Fed. R. Evid. 701(a) advisory committee's

27

note). Here, it is uncontested that Jackman had no personal knowledge of the investments in question. Therefore, the court properly barred his testimony.

Moreover, even though defendants now seize upon Jackman's precluded testimony to support their cries of "foul," it is obvious that excluding his testimony did them far more good than admitting his questionably relevant opinion would have. In his deposition, Jackman testified that it was not possible to guarantee the high rates of return promised by TIGC. Supp. App. 153-154. When he was asked how he would respond to someone who offered the sky-high returns and guarantee of principal promised by TIGC he responded: "I'd say you were nuts, and your [you're] inexperienced, and you don't know what you're talking about, and you're a fool." Id. at 156. It is hard to see how the defendants were prejudiced by excluding such testimony.

D.

Finally, the defendants contend that the district court erred in excluding certain "key exhibits" that they failed to list in the pretrial statement. Defendants assert that the admission of the documents would have "demonstrated that the Defendants acted in good faith, with no intent to defraud and had exercised some care in making investments." Appellant's Br. at 35.

We review a district court's decision to refuse to admit exhibits not previously identified for abuse of discretion. Greate Bay Hotel & Casino v. Tose, 34 F.3d 1227, 1236 (3d Cir. 1994). In determining whether there has been an abuse of discretion, we consider four factors: (1) the prejudice or surprise in fact to the opposing party, (2) the ability of the party to cure the prejudice, (3) the extent of disruption of the orderly and efficient trial of the case, and (4) the bad faith or willfulness of the non-compliance. Id. (quoting Beissel v. Pittsburgh and Lake Erie R. Co., 801 F.2d 143, 150 (3d Cir. 1986)). Here, the district court only excluded those documents that the defendants failed to produce, App. 144a-45a, and the district court properly considered the effect that admitting the evidence would have on the SEC. The court stated, "The Commission is entitled not to

28

be surprised. That's why we have all these procedures in Federal Court." Supp. App. 59. We find no abuse of discretion in that.

VII.

Accordingly, for the reasons set forth above, we will affirm the district court's Order for Final Injunction.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

29